Case No. 19-1612

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

DAVONTAE SANFORD,

*Plaintiff-Appellee*,

v.

THE CITY OF DETROIT,
MICHAEL RUSSELL and JAMES TOLBERT,
in their official and/or individual capacities,
jointly and severally,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

No. 17-13062 (Honorable David M. Lawson, *presiding*)

DEFENDANTS –APPELLANTS' -

***Oral Argument Requested***

**NEUFELD SCHECK & BRUSTIN, LLP**
By: Emma Freudenberger
    Nick J. Brustin
    Amelia Blaire Green
    Anna Benvenutti Hoffmann
    Bettina K. Roberts
*Attorneys for Plaintiff-Appellee*
99 Hudson Street, 8th Floor
New York, New York 10013
P: (212) 965-9081
F: (212) 965-9084
E: emma@nsbcivilrights.com
   nick@nsbcivilrights.com
   amelia@nsbcivilrights.com
   anna@nsbcivilrights.com
   bettina@nsbcivilrights.com


**GOODMAN HURWITZ & JAMES, P.C.**
By: William H. Goodman (P14173)
    Julie H. Hurwitz (P34720)
    Kathryn Bruner James (P71374)
*Attorneys for Plaintiff-Appellee*
1394 East Jefferson Avenue
Detroit, Michigan 48207
P: (313) 567-6170
E: bgoodman@goodmanhurwitz.com
   jhurwitz@goodmanhurwitz.com
   kjames@goodmanhurwitz.com

**SEWARD HENDERSON PLLC**
By: T. Joseph Seward (P35095)
    Kali M. L. Henderson (P76479)
    Michael T. Berger (P77143)
*Attorneys for Defendants-Appellants*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
E: jseward@sewardhenderson.com
   khenderson@sewardhenderson.com
   mberger@sewardhenderson.com

# TABLE OF CONTENTS

Index of Authorities ..................................................................................................v

Statement in Support of Oral Argument ................................................................ viii

Statement of Jurisdiction..............................................................................................1

Statement of Issues for Review....................................................................................2

Introduction...................................................................................................................3

Statement of Case..........................................................................................................4

    I.    Factual Background....................................................................................4

        A.  The Initial Encounter.........................................................................4

        B.  The First Confession - Conspiracy to Commit Murder ..............................6

        C.  The Second Confession – Murder.............................................................8

        D.  Pre-trial Criminal Proceedings...............................................................11

        E.  Criminal Trial..............................................................................14

        F.  Post-Conviction...............................................................................15

    II.  Procedural Background ...........................................................................16

Standard of Review .....................................................................................................18

Argument......................................................................................................................20

    I.    The Qualified Immunity Analysis .........................................................20

        A.  Law – A Two-Step Analysis..............................................................20

          i.  Step One: Do the Facts Support the Alleged Violation of a Constitutional Right?........................................................................................... 20

          ii.  Step Two: Was the Constitutional Right Clearly Established?.................. 21

        B.  Application – Multiple Officers..............................................................21

    II.  Fabrication of Evidence ...........................................................................22

        A.  Law – A Two-Step Analysis for Fabrication Claims ..............................22

          i.  Step One: Is the Evidence Fabricated?............................................ 23

          ii.  Step Two: Is There a Reasonable Likelihood the Evidence Affected the Decision of the Trier of Fact? ................................................................ 25

        B.  Analysis – Russell and Tolbert are Entitled to Qualified Immunity ........27

          i.  The First Confession .......................................................................... 28

       a.    There is Insufficient Evidence ...........................................................28

       b.    The Guilty Plea Bar ...........................................................................30

    ii.  The Second Confession ...........................................................................30

    iii. The Crime Scene Sketch ........................................................................31

       a.    The Sketch is Not Fabricated...........................................................32

       b.    The Guilty Plea Bar ...........................................................................33

  C.  The False Testimony .................................................................................34

III.    Coercion ....................................................................................................34

  A.  Law – The Totality of the Circumstances Test.........................................34

    i.  The Halbach/Dassey Investigation ........................................................36

    ii.  The Seventh Circuit's Analysis – Dassey Voluntarily Confessed.............39

  B.  Analysis – Plaintiff's Confessions were Voluntary....................................42

    i.  Plaintiff's Particular Vulnerabilities.....................................................43

    ii.  Interrogation Techniques .......................................................................46

    iii. Totality Analysis ....................................................................................48

IV.    Malicious Prosecution................................................................................50

  A.  Decision to Prosecute – Defendants were not Involved ...........................51

  B.  Probable Cause – Independently Established ...........................................52

  C.  Deprivation of Liberty - The Guilty Plea Bar ..........................................54

  D.  Favorable Termination – On-Going Investigation.....................................54

Relief Sought.......................................................................................................57

Certificate of Service ..........................................................................................58

Appendix ............................................................................................................59

Designation of Relevant District Court Filings ....................................................59

# INDEX OF AUTHORITIES

**Cases**

*Brown v. Jackson*,
   501 Fed. Appx. 376 (6th Cir. 2012)..........................................................................45

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................................18

*Craft v. Billingslea*,
   No. 17-CV-12752, 2017 W.L. 6039559 (E.D. Mich., December 6, 2017).............54

*Dunn v. State of Tenn.*,
   697 F.2d 121 (6th Cir. 1982).....................................................................................54

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982)...................................................................................................20

*Havener v. Ameji*,
   96 F. App'x 371 (6th Cir. 2004).................................................................................18

*Ledbetter v. Edwards*,
   35 F.3d 1062 (6th Cir. 1994).....................................................................................45

*Livermore v. Lubelan*,
   476 F.3d 397 (6th Cir. 2007) .....................................................................................20

*Malley v. Briggs*,
   475 U.S. 335 (1986)...................................................................................................20

*Northrop v. Trippett*,
   265 F.3d 372 (6th Cir. 2001) .....................................................................................52

*Pearson v. Callahan*,
   555 U.S. 223 (2009)...................................................................................................20

*Quigley v. Tuong Vinh Thai*,
  707 F.3d 675 (6th Cir. 2013) ................................................................21

*Reichle v. Howards*,
  132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)...........................................20

*Risbridger v. Connelly*,
  275 F.3d 565 (6th Cir. 2002) ................................................................21

*Saucier v. Katz*,
  533 U.S. 194 (2001)................................................................... 20, 21

*Sykes v. Anderson*,
  625 F.3d 294 (6th Cir. 2010) ...............................................................52

*Taylor v. Barkes*,
  135 S. Ct. 2042 (2015)..........................................................................20

*Thorp v. D.C.*,
  142 F. Supp. 3d 132 (D. D.C., 2015).....................................................54

*United States v. Campas*,
  No. CR 13-1164-TUC-CKJ L, 2014 W.L. 3887881 (D. Ariz., August 7, 2014).....47

*United States v. Kilgore*,
  58 F.3d 350 (8th Cir. 1995)...................................................................47

*United States v. Liu*,
  No. CRIM. 08-15 ADM/FLN, 2008 W.L. 1994975 (D. Minn., May 5, 2008)........47

**Statutes**

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1343 ....................................................................................1

## Other Authorities

Restatement (Second) of Torts § 658 (1977) ...............................................54

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellee requests that the Court entertain oral argument to address significant unresolved issues relating to liability arising out of a set aside conviction, the extent the law clearly defined the parameters of allowable police activities at the time of the events that give rise to the present claims, and the effect of a voluntary guilty plea.

## STATEMENT OF JURISDICTION

Plaintiff filed his complaint in Michigan's Eastern District Court on September 18, 2017. [*Complaint*, R. 1, Page ID 1]. The Complaint alleged Plaintiff's constitutional rights were violated, providing the District Court with subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

This court has jurisdiction under the "collateral order" doctrine because Defendants appeal the denial of qualified immunity at the summary judgment stage. *Leary v. Livingston Cty.*, 528 F.3d 438, 447 (6th Cir. 2008); *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985). [*Order re: MSJ*, R. 309, Page ID 14913-14940].

The order Defendants appeal was issued on May 15, 2019. [*Order re: MSJ*, R. 309, Page ID 14913-14940]. Defendants filed their notice of appeal on June 3, 2019. [*Notice of Appeal*, R. 328, Page ID 16077-16079].

## STATEMENT OF ISSUES FOR REVIEW

I.  Whether Defendants are entitled to Qualified Immunity on Plaintiff's claim that they fabricated evidence against him?

Appellants say, "*Yes.*"

Appellee says, "*No.*"

District Court said, "*No.*"

II.  Whether Defendants are entitled to Qualified Immunity on Plaintiff's claim that his confessions were coerced?

Appellants say, "*Yes.*"

Appellee says, "*No.*"

District Court said, "*No.*"

III.  Whether Defendants are entitled to Qualified Immunity on Plaintiff's claim that they maliciously prosecuted him?

Appellants say, "*Yes.*"

Appellee says, "*No.*"

District Court said, "*No.*"

## INTRODUCTION

After confessing multiple times and entering a guilty plea, DaVontae Sanford spent eight years in prison. He was released in 2016 after an investigation by the Michigan State Police prompted by the confession of another man to the same murders. Plaintiff then filed this lawsuit asserting that his constitutional rights were violated during the investigation and prosecution.

This Court must accept the facts in a light most favorable to Plaintiff; this Court need not accept the District Court's flagrantly wrong recitation of the record. For example, the District Court wrote that Defendant Tolbert testified regarding the disputed sketch at Plaintiff's bench trial. [*Opinion re: MSJ*, R. 309, Page ID 14918-14919]. Tolbert never testified at the criminal trial; he only testified during post-conviction proceedings.

Defendants raised the defense of qualified immunity. Plaintiff had the burden to rebut the defense. The evidence in the record does not allow Plaintiff to meet the threshold required by Rule 56. Thus, Defendants should be granted the protections of qualified immunity.

**STATEMENT OF CASE**

Plaintiff pled guilty to murdering four individuals in what is now known as "the Runyon Street murders." Prior to pleading guilty, Plaintiff led officers down a false trail. He knowingly and voluntarily made these representations to officers; he knowingly and voluntarily confessed to murder.

**I.    FACTUAL BACKGROUND**

On September 17, 2007, the home at 19741 Runyon Street in Detroit was violently attacked with gunfire. [*DPD Report*, R. 170-6, Page ID 8402]. Five individuals were wounded during the shooting, four of them fatally so. [*Id.*]. Two of the responding DPD officers were then-Sergeant Michael Russell and then-Commander James Tolbert. [*Id.*; *Tolbert Deposition*, R. 170-9, Page ID 8802, 8805].

**A. The Initial Encounter**

Russell encountered Plaintiff sometime after midnight. [*Plaintiff's Deposition*, R. 148-2, Page ID 5959-5960; *DPD Report*, R. 170-6, Page ID 8402]. Plaintiff was fourteen and walking by himself. [*Complaint*, R. 1, Page ID 2; *Evidentiary Hearing*, R. 148-13, Page ID 6185]. Plaintiff met Russell and Ofc. Collins; he told them he had not seen or heard anything because he was spending time with his uncle, Bill Rice, a Detroit police officer. [*Plaintiff's Deposition*, R. 148-2, Page ID 5959-5960].

Collins knew Rice and telephoned him. [*Id.*]. Over speakerphone, Rice told

4

Plaintiff to help the officers out, that the officers were "cool," and to tell them if he knew anything. [*Id.* at Page ID 5965]. Rice told them Plaintiff was from the neighborhood and would know what goes on in it. [*Id.*] Plaintiff does not remember what happened immediately next, but Collins and Russell remember Plaintiff telling them that he and some friends had planned to rob "Milk Dud," but he backed out. [*Id.* at 5967; *7-13-10 Evidentiary Hearing*, R. 148-6, Page ID 6072; *Russell Deposition*, R. 148-9, Page ID 6094-6095; *Trial Day 1*, R. 148-10, Page ID 6138].

In order to learn more of the robbery plan, the officers took Plaintiff to his grandmother's house, obtained her consent to interview him, and collected his tennis shoes. [*Plaintiff's Deposition*, R. 148-2, Page ID 5968-5969, 6001-6002]. Then Plaintiff voluntarily climbed into a car with officers, including Russell. [*Id.* at Page ID 5969-5970].

The officers drove to a local parking lot, during which time Plaintiff cannot recall any officer telling him why they, i.e. the police, were there. [*Id.* at Page ID 5971, 5973]. Plaintiff provided information about the activities in the neighborhood, including who was selling drugs and committing robberies. [*Id.* at Page ID 5972, 5974-5975]. He also provided the names of four individuals who committed those illegal acts: Tone, Tone Tone, Carrie, and Los. [*Id.* at 5975]. They drove around having this discussion for five minutes then drove to the Runyon property. [*Id.* at Page ID 5972, 5976].

5

At the Runyon property, someone opened the vehicle door and explained to Plaintiff that he would be conducting a "gunshot ballistics test." [*Id.* at Page ID 5977]. During this test, Plaintiff was not asked any questions about what took place at the Runyon address. [*Id.*]. Plaintiff was told to get into a different car with Russell and an older gentleman, and the three of them drove to a Coney Island restaurant where the officers purchased food, including a cheeseburger for Plaintiff. [*Id.* at Page ID 5978-5979, 5981]. From there, they drove downtown. [*Id.* at Page ID 5981]. During this entire time, Plaintiff does not remember anyone discussing the murders with him. [*Id.* at Page ID 5979-5981].

Upon arriving at the police station, the officers brought Plaintiff inside and sat him at a desk. [*Id.* at Page ID 5982]. Plaintiff was allowed to eat his cheeseburger and play on the computer. [*Id.*] Plaintiff browsed different websites while the officers ate. [*Id.*].

### B. The First Confession - Conspiracy to Commit Murder

After Plaintiff finished his meal, he spoke to Russell around 4 a.m. [*Plaintiff's Deposition*, R. 148-2, Page ID 5985-5986; *Preliminary Examination*, R. 148-12, Page ID 6169]. Plaintiff was read his Miranda rights and signed a form acknowledging the same. [*Plaintiff's Deposition*, R. 148-2, Page ID 5997; *Miranda Form*, R. 148-18, Page ID 6216]. Plaintiff identified Tone, Tone Tone, and Los from mugshots. [*Plaintiff's Deposition*, R. 148-2, Page ID 5985-5986]. Plaintiff does not

recall exactly what happened next, but admits that he told Russell about his involvement in the Runyon Street murders.[1] [*Id.* at Page ID 5986]. At his deposition, Plaintiff admitted he lied to Russell about this. [*Id.*, R. 148-2, Page ID 5955].

Unaware of Plaintiff's lies, Russell typed Plaintiff's words into a formal statement. [*1st Statement*, R. 148-17, Page ID 6212-6214]. Plaintiff was allowed to sleep on a couch during this time. [*Plaintiff's Deposition*, R. 148-2, Page ID 5987-5988]. He was then awoken by DPD Officer Barb Simon and given the typed statement. [*Id.*]. The typed statement included six preliminary questions; Plaintiff answered each in his own handwriting, wrote his name after each answer, and signed his name after each factual statement. [*1st Statement*, R. 148-17, Page ID 6212; *Plaintiff's Deposition*, R. 148-2, Page ID 5990-5991]. This statement details how Plaintiff planned to rob "Milk Dud" at gun point but bailed at the last minute. [*1st Statement*, R. 148-17, Page ID 6212].

Given his current claim that this confession was fabricated, Plaintiff was asked at his deposition what information in the first confession he did not provide to Russell; he did not know. [*Plaintiff's Deposition*, R. 148-2, Page ID 5992-5995]. He

---

[1] The District Court did not address or acknowledge this statement, leading to an inaccurate portrayal of the information known to the officers in 2007. [See *Opinion re: MSJ*, R. 307, Page ID 14888].
Plaintiff told Russell that he did not participate in the crime that night. [*Opinion re: MSJ*, R. 307, Page ID 14888; *Tolbert Deposition*, R. 170-9, Page ID 8817; *1st Statement*, R. 148-17, Page ID 6212-6214].

7

could not identify which statements were not made by him.[2] [*Id.*]. Plaintiff has never identified what information the police officers shared with him regarding the crime.

After signing the statement, Plaintiff was fed again and then driven home. [*Id.* at Page ID 5987-5988]. At no point was Plaintiff ever in handcuffs or under arrest during the aforementioned time period. [*Id.* at Page ID 5990, 5996-5997].

## C. The Second Confession – Murder

After working to confirm the details in Plaintiff's confession, Russell discovered Plaintiff had lied. [*Russell Deposition*, R. 148-9, Page ID 6094-6095]. Russell returned to Plaintiff's home and spoke to Plaintiff's mother. [*Plaintiff's Deposition*, R. 148-2, Page ID 5989]. Russell told her Plaintiff was not being forthcoming about the Runyon Street murders and asked to take Plaintiff back downtown to question him again. [*Id.*]. She consented to the second interview, signed a consent form, and told Plaintiff to tell the truth. [*Id.*].

---

[2] In response to Defendants' Summary Judgment Motion, Plaintiff submitted an affidavit that contradicted this deposition testimony. [*Contrary Declaration*, R. 170-16, Page ID 9008-9011]. Plaintiff testified regarding everything that occurred and everything he heard while he was at the police station. [*Plaintiff's Deposition*, R. 148-2, Page ID 6001, R. 172-2, Page ID 10083]. This affidavit, which asserts that the incriminating information came from the police, contradicts his testimony wherein Plaintiff did not know where the incriminating information came from. The District Court should not have considered this declaration over Defendants' objection. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012); Fed. R. Civ. P. 56(c)(2).

While driving back to the station, Russell told Plaintiff, "You know you haven't been telling the truth." [*Id.* at Page ID 5989, 6005]. Russell also told Plaintiff tests had come back positive for blood on Plaintiff's shoes. [*Id.* at Page ID 6005]. In response, Plaintiff told Russell about a dog fight that resulted in the blood on his shoes. [*Id.*]. Plaintiff did not recall any other conversations during the car ride. [*Id.*].

At the station, Plaintiff was taken to Russell's desk. [*Id.* at Page ID 6006]. Russell began by telling Plaintiff he was lying. [*Id.* at Page ID 6008]. Plaintiff admits that Russell was correct; he was lying. [*Id.*]. Russell repeated his statement regarding the blood and Plaintiff, again, stated the he did not know anything. [*Id.*]. Russell grabbed a camera, showed Plaintiff pictures of bodies at the crime scene, and said, "This is not a game. People lost their lives here." [*Id.* at Page ID 6011]. Plaintiff does not remember how many pictures he saw, how long he viewed them for, or what the camera looked like. [*Id.* at Page ID 6009, 6011-6013].

Russell and other officers, including Tolbert, then exited the area. [*Plaintiff's Deposition*, R. 148-2, Page ID 6014]. The group then came back in, asked Plaintiff questions (that he does not recall), and stepped back out to talk amongst themselves. [*Id.* at Page ID 6014-6015]. Plaintiff could not hear what was said when they left the room. [*Id.* at Page ID 6016]. Tolbert re-entered the area, grabbed some paper and a chair, sat down next to Plaintiff and drew a sketch. [*Id.* at Page ID 6015]. He then asked Plaintiff to draw where the bodies were located. [*Id.* at Page ID 6015, 6017].

9

Plaintiff drew the bodies and signed the sketch as directed. [*Id.* at 6018; *Sketch*, R. 148-22, Page ID 6233]. The sketch was also signed by Russell. [*Sketch*, R. 148-22, Page ID 6233].

Russell resumed questioning Plaintiff about the Runyon Street murders. [*Plaintiff's Deposition*, R. 148-2, Page ID 6018, 6023-6024]. This discussion lasted two hours. [*Id*.]  Russell told Plaintiff the group could not have met at the Coney Island because the Coney Island was closed. [*Id.* at Page ID 6027]. After this 'suggestion,' Russell asked, "Well, where did you all meet at or who house did you all meet at[?]" [*Id.*]. Plaintiff told him they met at "so and so house." [*Id.*] Plaintiff remembers Russell taking a phone call and saying, "That's your mama. Come on. We gotta hurry up. Let's finish this so I can get you home so you can be in school tomorrow." [*Id.* at Page ID 8984].

Russell next told Plaintiff they needed to go do something before taking him home. [*Plaintiff's Deposition*, R. 148-2, Page ID 6028]. They drove to a different police station where video recording equipment had recently been installed. [*Id.*; *7/21/09 Evidentiary Hearing*, R. 170-37, Page ID 9437]. Russell reviewed Plaintiff's *Miranda* rights with him in the parking lot before entering. [*Plaintiff's Deposition*, R. 148-2, Page ID 6028]. Russell then took him into the station where he was fingerprinted, photographed for a mugshot, and taken upstairs to a room. [*Id.*].

What happens next was captured on video. [*Video*, R. 148-14, filed as Exhibit 13 to Defendant's Motion for Summary Judgment]. Russell reviewed Plaintiff's *Miranda* rights again. [*Id.*]. Russell stated that they were going to review the memorialized version of their conversation that day. [*Id.*; see also *Video Transcript*, R. 148-15, Page ID 6197]. He then went over the second typed statement with Plaintiff, while Plaintiff initialed the statements he agreed with. [*Id.*]. Sanford initialed every statement and signed both pages. [*Plaintiff's Deposition*, R. 148-2, Page ID 6030, 6036-6037; *Video*, R. 148-14; *Second Statement*, R. 148-16, Page ID 6209-6210]. This statement is a confession to murder. [*Second Statement*, R. 148-16, Page ID 6209-6210].

Plaintiff was questioned at his deposition regarding the statements contained in the second confession. [*Plaintiff's Deposition*, R. 148-2, Page ID 6031-6037]. He, again, could not identify what information in the statement did not come from him. [*Id.*]. He has never identified what information contained in the second statement was told to him by either defendant. Russell testified that he did not tell Plaintiff what to say in the statement. [*Trial Day 1*, R. 148-10, Page ID 6155; *Russell Deposition*, R. 148-9, Page ID 6096].

### D. Pre-trial Criminal Proceedings

Ofc. Barb Simon prepared and a submitted a warrant request to the Wayne County Prosecutor's office. [*Warrant Request*, R. 148-24, Page ID 6238]. The

warrant request included Plaintiff's second statement. [*Id.*]. The Prosecutor's office approved charges against Plaintiff for first-degree murder, felony murder, assault with intent to murder, armed robbery, and felony firearms. [*Id.*]. The prosecutor that approved the charges was Stephanie L. Zeiger. [*Id.* at Page ID 6242].

A preliminary examination was held on October 1, 2007. [*Preliminary Examination*, R. 148-12, Page ID 6166-6180]. Surviving witness Valerie Glover and Russell were the only witnesses to testify. [*Preliminary Examination*, R. 170-20, Page ID 9041]. The written statements, sketch, and video recording were all entered into evidence without objection from Plaintiff's counsel. [*Preliminary Examination*, R. 148-12, Page ID 6173-6179].

During the exam, Glover testified that she ran to the back bedroom during the shooting. [*Preliminary Examination*, R. 58-6, Page ID 1593-1594]. While hiding, a gunman entered carrying a "long gun" and spoke to her. [*Id.* at Page ID 1596]. She described the gunman as having a "soft voice not like a man" with no bass to his voice. [*Id.* at Page ID 1597-1598]. She also described him as thin, black, and clothed in black. [*Id.* at Page ID 1597-1598]. She testified that, based on the noises and voices she heard, there were three or four perpetrators that entered the home. [*Id.* at Page ID 1600].

Russell testified that Plaintiff drew the sketch of the layout of the living room and where the bodies were located within it. He also testified that Plaintiff had no

12

problems communicating with him and did not appear to be impaired by drugs or alcohol. [*Id.* at Page ID 1609-1632; 1639-1643]

Following Plaintiff's arraignment in October 2007, his competency to waive his *Miranda* rights and understand criminal responsibility were examined by Dr. Lynn Schwartz on November 7, 2007. [*Arraignment*, R. 148-25, Page ID 6245; *12-19-07 Competency Hearing*, R. 148-27, Page ID 6265; *Dr. Schwartz Deposition*, R. 148-26, Page ID 6251, 6252]. Dr. Schwartz found no evidence that Plaintiff had mental retardation and concluded there was nothing to suggest he could not appreciate the nature or quality of the charges. [*Dr. Schwartz Deposition*, R. 148-26, Page ID 6253]. On December 19, 2007, Plaintiff's lawyer stipulated that Plaintiff was competent to waive his Miranda rights and he understood criminal responsibility. [*12-19-07 Competency Hearing*, R. 148-27, Page ID 6265-6268; *Order on Competency*, R. 148-28, Page ID 6270).

Sanford's trial was scheduled to begin on January 28, 2008, however, he was given additional time to discuss a plea offer with his family. [*Cancelled Trial*, R. 148-32, Page ID 6296-6304]. Plaintiff spoke to his family about his options before the rescheduled trial. [*Plaintiff's Deposition*, R. 148-2, Page ID 6038]. Plaintiff also underwent an additional competency exam, this time to examine his competency to stand trial. [*Dr. Schwartz Deposition*, R. 148-26, Page ID 6251, 6254]. This exam found that Plaintiff: was able to recite the charges against him; understood the charges

13

could lead to life in prison; understood he was in adult court, not juvenile court; understood the difference between lawyers, judges, and jurors; understood the difference between a guilty verdict, not guilty verdict, and a plea; understood he did not have to speak to the police; understood that anything he said could be used against him in court; understood that he could have an attorney appointed to him; and understood how to deal with a situation if he thought a witness lied in court (i.e. inform his lawyer). [*Id.* at Page ID 6255-6262]. Plaintiff did not demonstrate any cognitive impairments that would interfere with his ability to comprehend the legal process. [*Id.* at Page ID 6261-6262].

### E. Criminal Trial

Plaintiff's criminal trial occurred over two days, March 17 through 18, 2008, ending when Plaintiff entered a guilty plea. [*Trial Day 1*, R. 58-7, Page ID 1648; *Trial Day 2*, R. 58-8, Page ID 1711, 1780]. At trial, multiple witnesses testified, including Russell, Jessie King (neighbor that engaged in gunfire with the perpetrators as they ran away), DPD canine Officer Chris Salisbury, and Valerie Glover. [*Id.*]. Prosecutor Muscat presented evidence that Glover identified Plaintiff's voice as consistent with one of the perpetrator's voice, that the perpetrators were wearing black, that Sanford's black pants had gunshot residue on them, and that a canine track for the perpetrators led to the street Plaintiff lived on. [*Trial Day 1,* R.148-

14

10, Page ID 6133; *Trial Day 2*, R. 148-34, Page ID 6382, 6339, 6359-6360, 6365-6366, 6375-6377; *Gunshot Residue Results*, R. 148-36, Page ID 6405].

During trial, Russell testified twice regarding the sketch. On day one, he was asked to confirm an exhibit as the "sketch [drawn] on September 18th, where [Plaintiff] described the layout of the bodies." [*Trial Day 1,* R. 148-10, Page ID 6154]. On day two, he was asked, "Regarding the sketch that Mr. Sanford drew for you…[d]id you ever take him inside that house and show him those bodies before he drew that sketch?" [*Trial Day 2*, R. 148-34, Page ID 6379]. He answered, "No." [*Id.*]. He then clarified that the sketch was drawn during the second interview by Plaintiff, prior to the video recording. [*Id.* at Page ID 6379-6380]. Following this testimony, a break was taken and then Plaintiff's guilty plea was entered and accepted by the Court. [*Id.* at Page ID 6380-6381].

During the plea hearing, Plaintiff testified under oath. [*Id.* at Page ID 6383-6400]. He was questioned by the court regarding the crime, the circumstances leading up to the plea, and the consequences of the plea. [*Id.*]

### F.  Post-Conviction

After Plaintiff pled guilty, Vincent Smothers, while in custody for other crimes, admitted to committing the Runyon Street murders. Smothers denied that Sanford was involved. Smothers has not been charged for the Runyon Street murders. After several post-conviction filings, hearings, and an investigation by the Michigan State Police, the

15

charges against Plaintiff were dismissed without prejudice. The dismissal, as discussed by Judge Brian Sullivan in his opinion dismissing the criminal case, was based on too many "unanswered questions and … confusion," including uncorroborated statements from Smothers, Tolbert's statement that he drew a portion of the crime scene sketch previously attributed to Plaintiff, and Bill Rice's false alibi for Plaintiff that drew perjury charges. [*Opinion re: Criminal Case Dismissal*, R. 148-74, Page ID 6582-6585].

## II.    PROCEDURAL BACKGROUND

Plaintiff filed his Complaint on September 18, 2017, and alleged violations of Plaintiff's constitutional rights, including his Fourth, Fifth, and Fourteenth Amendment rights. [*Complaint*, R. 1, Page ID 1-47]. The Complaint contained four numbered counts and was filed against three defendants, the City of Detroit, and two police officers, Michael Russel and James Tolbert. [*Id.*].

Defendants filed a Motion to Dismiss the Complaint based on qualified immunity on March 30, 2018. [*Motion to Dismiss*, R. 36, Page ID 411-645]. This motion remained pending throughout the entire course of discovery; Judge Lawson refused to stay discovery while this qualified immunity motion was pending. [*Amended Case Management and Scheduling* Order, R. 73, Page ID 2165]. The District Court finally issued an opinion on the motion on December 4, 2018. [*Order re: Motion to Dismiss*, R. 142, Page ID 5843-5868]. The District Court granted the

16

motion in part, dismissing the City of Detroit because City's bankruptcy barred Plaintiff's claims. [*Order re: Motion to Dismiss*, R. 142, Page ID 5843].

On December 11, 2018, Defendants filed their Motion for Summary Judgment requesting dismissal of all counts against them, raising the defense of qualified immunity. [*MSJ*, R. 148, Page ID 5890-6586]. Plaintiff filed a response to the motion on January 11, 2019. [*Plaintiff's MSJ Response*, R. 170, Page ID 8321-10032]. Defendants' then filed a reply in support of their motion on January 25, 2019. [*MSJ Reply*, R. 172, Page ID 10042-10220].

Following the briefing on the Motion for Summary Judgment, the parties entered a stipulation dismissing Plaintiff's claim brought under the Americans with Disabilities Act. [*Stipulation re: ADA Claim*, R. 208, Page ID 11453-11455]. The District Court entered an order to that effect on February 28, 2019. [*Order of Partial Dismissal*, R. 210, Page ID 11457].

The parties then stipulated to the dismissal of Plaintiff's claim regarding the postconviction suppression of evidence. [*Stipulation re: Postconviction Suppression*, R. 249, Page ID 13325-13328]. The District Court entered an order to that effect on March 27, 2019. [*Order of Partial Dismissal*, R. 282, Page ID 13719].

The District Court denied Defendants' Motion for Summary Judgment on May 10, 2019. [*Order Denying Summary Judgment*, R. 307, Page ID 14885-14911].

17

## SUMMARY OF ARGUMENT

Plaintiff is bound by the guilty plea he entered during the criminal trial and Defendants are entitled to qualified immunity, as their conduct never crossed the constitutional line of clearly established law.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant summary judgment *de novo*. *Havener v. Ameji*, 96 F. App'x 371, 372 (6th Cir. 2004). Whether an affidavit from the plaintiff, which contradicts the plaintiff's deposition testimony, submitted in response to a motion for summary judgment should be considered in the summary judgment record is reviewed under an abuse of discretion standard. *Powell-Pickett v. AK Steel Corp*, 549 F. App'x. 347, 352 (6th Cir. 2013).

The initial burden of demonstrating the nonexistence of a genuine issue of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts to support their allegations, and must present more than a "mere scintilla" of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They hold the *obligation* "to make [their] case with a showing of facts that can be established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "[A] party may

18

not avoid summary judgment by resorting to 'speculation, conjecture, or fantasy.'" *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Under the *de novo* standard, this Court is permitted to take a "fresh look" at the issues presented. *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir. 2005). This Court is to conduct an "independent assessment of the record" and independently review the merits of the claims. *Benjamin v. Brachman*, 246 F. App'x. 905, 914 n 8 (6th Cir. 2007); *Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x. 834, 842 (6th Cir. 2018). "[T]he test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one." *Hts. Cmty. Cong v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985).

An abuse of discretion review is "governed by the situation and circumstances affecting each individual case."*Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Lavin v. Husted*, 764 F.3d 646, 649 (6th Cir. 2014).

19

## ARGUMENT

### I.    THE QUALIFIED IMMUNITY ANALYSIS

#### A.    Law – A Two-Step Analysis

The doctrine of qualified immunity protects government officials from civil liability to the extent that their conduct does not violate clearly established law. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As originally announced in *Saucier v. Katz*, there are two parts to any qualified immunity analysis: (1) whether a constitutional right was violated, and (2) whether the right was clearly established. 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). These inquires do not need to be answered in numerical order. *Pearson*, 555 U.S. at 236.

Qualified immunity protects an officer who makes a mistake in judgment, whether that mistake is one of law, fact, or both. *Id.* The doctrine "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

##### i.    Step One: Do the Facts Support the Alleged Violation of a Constitutional Right?

When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to the defense. *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). At the summary judgment

stage, this requires that the plaintiff present facts, that when viewed in the light most favorable to him/herself, would permit a reasonable juror to find a violation of a constitutional right. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).

### ii. Step Two: Was the Constitutional Right Clearly Established?

If the plaintiff is able to draw a sufficient connection between an officer's conduct and a constitutional violation, the analysis turns to whether the right was clearly established at the time. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Therefore, the constitutional right "must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). A right is clearly established if there is binding precedent directly on point, such that pre-existing law has made the unlawfulness of the conduct readily apparent to a reasonable officer. *Risbridger*, 275 F.3d at 569.

### B.    Application – Multiple Officers

Each Defendant has raised qualified immunity in defense to Plaintiff's claims for Fabrication of Evidence, Coercion, and Malicious Prosecution. Each of these claims must be analyzed on an individual basis. *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (holding that an officer can only be liable for his actions and not those of other officers or third parties).

## II.    FABRICATION OF EVIDENCE

### A.    Law – A Two-Step Analysis for Fabrication Claims

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). Thus, a police officer can be liable for his/her nontestimonial fabrication of evidence, i.e. the creation of the false evidence, not the testimony regarding the evidence. *Gregory v. City of Louisville*, 444 F.3d 725, 739 (6th Cir. 2006). Testimony regarding fabricated evidence must be treated as a separate and distinct act from the fabrication.[3] *Id.* (holding that testimony about fabricated evidence was shielded by absolute immunity but the underlying act was not). This Circuit analyzes the nontestimonial act of fabrication under the Fourteenth Amendment. *Stemler*, 126 F.3d at 872; see also *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) (explaining treatment of fabrication claims by various Circuits).

The analysis of fabricated evidence cannot turn on the general principle that fabricated evidence is unconstitutional. This is undisputed but far too general in application. It must, similar to excessive force violations, analyze the specific conduct to determine whether a violation occurred.

---

[3] A plaintiff may not maintain a civil action on the basis of a police officer's testimony as such claims are barred by absolute immunity. *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012); *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983).

### i.    *Step One: Is the Evidence Fabricated?*

In analyzing a fabrication claim, the first step is to determine whether the evidence in question actually constitutes 'fabricated evidence.' *See Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015) (analyzing each piece of allegedly fabricated evidence). This Circuit has yet to formally define 'fabricated evidence,' however the term has been defined through case law, legal dictionaries, and other circuits. The Seventh Circuit defines 'fabricated evidence' as evidence manufactured by the police or prosecutor that they know to be false. *Petty v. City of Chicago,* 754 F.3d 416, 422–23 (7th Cir. 2014). Black's Law Dictionary defines it similarly, as "false or deceitful evidence that is unlawfully created, usually after the relevant event, in an attempt to achieve or avoid liability or conviction." *Black's Law Dictionary* (11th ed. 2019).

Prior to Plaintiff's 2007 interrogation, this Circuit defined "fabricated" through case law, including *Alioto*, *Spurlock, Gregory,* and *Hinchman*. In 1987, the *Alioto* defendants were accused of conspiring to, and presenting, false testimony. *Alioto v. City of Shively,* 835 F.2d 1173, 1174 (6th Cir. 1987). This Court held these acts could not support liability because the defendants were entitled to absolute immunity for their testimony. *Id.* Next, in 1999, this Court issued the *Spurlock* opinion, holding that completely concocting a witness's testimony constituted fabrication. *Spurlock v. Satterfield*, 167 F.3d 995, 1004 (6th Cir. 1999). In *Spurlock,* the officers bribed a witness to present false testimony and presented that witness

23

with the details to include in his false testimony. *Id.* Such acts constituted fabrication. *Id.*

In 2002, in *Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2002), two officers were accused of making false statements to a state trooper and prosecutor to create probable cause. The pre-arrest and pre-preliminary examination statements were fabrications. *Id.* Last, in 2006, in *Gregory*, this Court ruled that a crime lab examiner fabricated evidence by creating a report that failed to acknowledge existence of hairs that did not match the suspect. *Gregory*, 444 F.3d at 744. The fabrication laid in the examiner's deliberate withholding of the existence of evidence. *Id.*

Active deception on the part of the officer is the common thread through each of these cases. As *Alioto* shows, the deception must lie in nontestimonial acts. *Alioto,* 835 F.2d at 1174. As of 2007, an officer who took deliberately deceptive actions to create a piece of evidence was guilty of fabricating evidence. In *Spurlock*, the active deception is seen in the officers' bribery and conveyance of facts to the witness. *Spurlock*, 167 F.3d at 1004. In *Hinchman*, it lies in the false representations to the state trooper and prosecutor. *Hinchman,* 312 F.3d at 205. And, in *Gregory*, it is seen in the deliberate withholding of the non-matching forensics in a written report. *Gregory*, 444 F.3d at 744. This Court's more recent holding in *Webb*, confirms that non-testimonial active deception is a required element of a fabrication claim.

24

In *Webb*, this Circuit considered three distinct pieces of evidence: an incorrectly dated recording (the "N-17 recording"), a recording with deletions (the "N-18 recording"), and a report with false information (the "DEA-6 report"). *Webb*, 789 F.3d at 667-70. All three were held to be fabrications. The N-17 recording constituted fabricated evidence where it had purposefully been misdated to create the presumption it was made earlier than it was actually recorded. *Id.* at 668. The N-18 recording that had portions deleted was fabricated evidence because it was altered such that it did not present a complete picture. *Id.* at 669. The report was fabricated because it contained statements that did not accurately reflect the facts. *Id.* at 670. In sum, all three pieces of evidence were the result of active deception, i.e. misdating, altering, or withholding, and, thus, were fabricated.

Based on the foregoing, the first question to answer in the analysis of a fabrication claim is whether evidence was actually fabricated. In the context of a qualified immunity defense, this also requires asking whether the law at the time of the alleged violation was clearly established such that a reasonable officer would know that his conduct constituted fabrication. In this case, the answer to both questions is no.

### ii.    Step Two: Is There a Reasonable Likelihood the Evidence Affected the Decision of the Trier of Fact?

The second step of the analysis is to determine whether a "reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Stemler*, 126 F.3d at 872. To satisfy this element, the fabricated evidence must have been

25

used against the plaintiff such that it affected the jury in a material fashion. *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980) (explaining that "the existence of a false police report, sitting in a drawer in a police station, [does not,] by itself deprive[] a person of a right secured by the Constitution and laws."). In *Webb*, this Court held that a fabrication claim could not be maintained based on two false statements that were immaterial discrepancies because they would not have reasonably affected the decision of the jury. *Webb*, 789 F.3d at 669. While in *Garner v. Grant*, this Court stated that an acquittal was clear evidence that allegedly fabricated evidence did not affect the jury. 328 F. App'x 325, 328 (6th Cir. 2009). Thus, a plaintiff must demonstrate that the trier of fact was impacted by the fabricated evidence in reaching a decision.

This second step is consistent with the Supreme Court's long held precedent that a knowing and voluntary guilty plea waives the right to challenge underlying constitutional violations. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). This Circuit recognized that an ***unconditional***[4] guilty plea limits the pleader to challenging "only the court's jurisdiction and the voluntary and intelligent character of the plea itself." *Werth v. Bell*, 692 F.3d 486, 495 (6th Cir. 2012). In *Tollett*, the Supreme Court criticized the lower courts for taking "too restrictive" of an approach

---

[4] An *Alford* plea was not entered by Plaintiff, nor does he argue that it was not available to him.

26

to its precedent regarding guilty pleas in the *Brady* trilogy of *Brady v. United States, McMann v. Richardson*, and *Parker v. North Carolina*. *Tollett*, 411 U.S. at 265. Justice Rehnquist explained that in each of those cases the Court refused to address the claims that the confessions were coerced by constitutional deprivations because of the guilty pleas. *Id.* at 265-66.

The Court acknowledged that in each trilogy case, "the facts giving rise to the constitutional claims were generally known to the defendants and their attorneys prior to the entry of the guilty pleas…" *Id.* at 266. In *Tollett*, the alleged violation was unknown to the respondent and his attorney. *Id*. Even then the Court held that this did not matter, because the issue is not one of mere waiver, but goes beyond that. *Id.* Therefore, the Court held that the respondent could not challenge the "claimed antecedent constitutional violations" following his guilty plea. *Id*.

**B.     Analysis – Russell and Tolbert are Entitled to Qualified Immunity**

Plaintiff alleges that Defendants fabricated the following evidence: (1) Plaintiff's first confession; (2) Plaintiff's second confession; (3) the sketch of the crime scene; and, (4) his testimony. Applying this two-step analysis in the context of qualified immunity reveals why Defendants are entitled to dismissal for each alleged fabrication.

27

### i.    The First Confession

Plaintiff alleges Defendants fabricated his first confession by feeding him details of the crime. Plaintiff cannot identify what details Russell fed him; identify what details Tolbert fed him; demonstrate that the fabrication impacted the trier of fact. Thus, Plaintiff cannot prove a constitutional violation.

### a.    There is Insufficient Evidence

Plaintiff failed to meet his evidentiary burden. He relies on speculation to suggest that Russell and Tolbert fed him details of the crime. Plaintiff admits:

- none of the officers told him anything about the crime after they picked him up and drove to the local parking lot, [*Id.* at Page ID 5971, 5973];

- no one discussed the crime with him when they next took him to the Runyon house to conduct the "gunshot ballistics test," [*Id.* at Page ID 5977];

- he does not remember anyone discussing the murders during that time; [*Id.* at Page ID 5979-5981];

- he does not remember anyone discussing the murders while next driving to the coney island, or after while driving downtown to the station. [*Id.*]

Plaintiff failed to identify any time when either Defendant fed him details before he made his statements to Russell about his involvement. He admits to lying to Russell about his involvement in the Runyon Street murders. [*Plaintiff's Deposition*, R. 148-2, Page ID 5955].

As Defendants deny ever providing Plaintiff with details of the murders, there

28

is no evidence that these specific officers fabricated his first confession. Plaintiff's assertion that Defendants must have fed him details of the crime because he was not there is speculation. Plaintiff acknowledges regurgitating, in his confessions, the facts fed to him, but cannot identify the source of those facts. He cannot say whether it was Russell, Tolbert, or others that he interacted with prior to his confession that fed him unspecified details.

For qualified immunity purposes, Plaintiff must identify which facts Russell provided and separate those from the facts that Tolbert provided so the court can analyze if that activity was clearly established as being unconstitutional. This is particularly true given that Tolbert had limited contact with Plaintiff, and Plaintiff cannot identify what facts he knew as compared to what facts he claims were given to him. See *Allen v. Wal-Mart Stores, Inc.*, 602 F. App'x 617, 621 (6th Cir. 2015) (holding that an email following up on plaintiff's reassignment during FMLA leave was only speculative evidence to support plaintiff's FMLA interference claim where other evidence established reassignment decision was made prior to plaintiff's leave and could not defeat proper summary judgment motion); *Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) (holding plaintiff's affidavit stating defendant must have known about complaints was speculative with no evidence in the record to support statements that attempt to establish knowledge on behalf of defendant); Without identifying what information Russell or Tolbert specifically provided in the

29

confessions, Plaintiff's claims against each should fail.

### b.  The Guilty Plea Bar

Plaintiff cannot fulfil the second element of a fabrication in regards to the first confession because he pled guilty. Plaintiff's criminal case went before a judge for a bench trial; thus, he must demonstrate that the fabricated evidence materially affected the judge's decision. Plaintiff cannot do so here. The judge never made a decision. Plaintiff entered an unconditional guilty plea, acknowledging and detailing his specific involvement in the murders. [*Plea*, R. 148-34, Page ID 6382-6400]. The trial court judge who accepted Plaintiff's guilty plea, in response to Plaintiff's motion to set aside his plea, wrote:

> ***[Plaintiff] has made strenuous efforts to posture his conviction as being the result of a false confession. [Plaintiff's] conviction is the result of his guilty plea.***

[*Opinion re: Denial of Motion to Withdraw Plea,* R. 148-67, Page ID 6536 (emphasis added)].

Thus, Plaintiff is unable to satisfy either prong of the fabricated evidence analysis.

### ii.    The Second Confession

Plaintiff alleges that Defendants also fabricated his second confession by feeding him details of the crime. As to this confession, Plaintiff points to only one instance where Russell provided him details he may not have had regarding the crime; he alleges that during the second interview, Russell showed him pictures of

30

the crime scene. [*Plaintiff's Response to MSJ*, R. 170, Page ID 8348]. He does not allege that Tolbert provided him any details to aid in the second confession; this claim should be dismissed as to Tolbert.

Russell is entitled to dismissal for two reasons. First, dismissal is proper due to Plaintiff's guilty plea, see Section (I)(B)(i)(b). Second, it was not clearly established in 2007 that showing a suspect photographs of the crime scene constituted fabrication. There was no active deception in this act. The photographs were accurate. Russell did not tell Plaintiff to include details from the photographs in his statement. Russell did not prepare a report stating that he did not show Plaintiff photographs. Russell did not alter a report to delete reference to the photographs. The evidence solely demonstrates that Russell showed Plaintiff the photographs and said, "This shit's serious. …This is serious. This is not a game. These people lost their lives." [*Plaintiff's Deposition*, R. 148-2, Page ID 6008]. In September 2007, no case law would have condemned this interview technique.

Plaintiff failed to demonstrate that this conduct constitutes fabrication. Russell is entitled to qualified immunity because Plaintiff cannot demonstrate that clearly established law forbade this conduct.

### iii.    The Crime Scene Sketch

Plaintiff next alleges Defendants fabricated the sketch of the crime scene. This claim suffers the same fate as his first two alleged fabrications because Plaintiff

31

cannot overcome either hurdle of the qualified immunity defense. As to the first prong, Plaintiff cannot establish that the sketch constitutes fabricated evidence, nor that his guilty plea does not bar the claim. As to the second prong, clearly established law in 2007 did not prohibit this interview technique. This claim should be dismissed as to both Russell and Tolbert.

### a. The Sketch is Not Fabricated

Plaintiff contends that the crime scene sketch constitutes fabricated evidence because Tolbert drew the layout of the room and Plaintiff only added the bodies. There is no dispute as to the accuracy of the sketch. There is no argument that the Defendants altered the sketch after it was seen, accepted, drawn on, and signed by Plaintiff. There is nothing about the sketch itself that is false or deceptive.  Plaintiff alleges it constitutes fabricated evidence because it was later represented as being drawn by Plaintiff. This evidence is not fabricated and delineating the actions of each Defendant demonstrates why dismissal is appropriate.

Tolbert's only participation in the creation of this fabricated evidence was drawing the layout of the room and asking Plaintiff to include the bodies. This interview technique is not improper; and, in 2007, no case law would have informed Tolbert that it was improper. Moreover, prior to Plaintiff's guilty plea, Tolbert never represented anything to the contrary. He never testified in court. He never authored

32

a report representing that Plaintiff drew the entire sketch. He did not interact with the prosecuting attorneys. There was no active deception on the part of Tolbert.

There was no active deception by Russell in creating the sketch either. No details were added to or erased from the sketch. No instructions were given to include things in the sketch. It has been implicitly suggested by Plaintiff, and explicitly stated by Judge Lawson, that Russell *must* have represented to the prosecution at some point that Plaintiff drew the outline of the house and the bodies. This assertion is based on speculation; neither Russell nor the prosecutor provided evidentiary support for that assumption. A review of the sketch dispels such a guess. The signatures of both Plaintiff and Russell are on the sketch raising the question, not an affirmation of fact, as to who drew what portion of the sketch.

Plaintiff cannot establish that this sketch constitutes fabricated evidence or that clearly established law would have forewarned Russell against this technique. Russell is entitled to dismissal of this claim.

### b. The Guilty Plea Bar

Plaintiff's guilty plea also bars his fabrication claim based on the sketch as to both Defendants. *See Section (B)(i)(b).*

33

### C. The False Testimony

Plaintiff alleges that the Defendants fabricated evidence by testifying falsely. Plaintiff cannot establish a constitutional violation to support this claim for two reasons. First, as to Tolbert, he did not testify at the preliminary examination or trial. Second, witnesses are entitled to absolute immunity for their testimony. *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012); *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983). Liability cannot be maintained on the basis of a police officer's testimony. *Id.* This claim must be dismissed.

## III.    COERCION

### A.    Law – The Totality of the Circumstances Test

A confession does not violate the Fifth Amendment unless a plaintiff can demonstrate that coercive police activity preceded it. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive police activity is that which "overbear[s] the accused's will to resist." *United States v. Hunter*, 332 F. App'x 285, 288 (6th Cir. 2009) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994)). To support a claim that a confession was coerced, a plaintiff must satisfy three elements:

(1) that the police activity was objectively coercive;

(2) that the coercion in question was sufficient to overbear the plaintiff's will; and,

(3) that the alleged police misconduct was the crucial motivating factor in the plaintiff's decision to confess.

34

*Id.* (quoting *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir.1999)). In determining whether these elements are satisfied, the court considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Factors to consider in this analysis include: age, education, intelligence, physical condition, emotional state, expressed fears of violent retaliations, physical punishment, the proximity in time of the coercive conduct and the confession, prior experience with the criminal justice system, whether *Miranda* advisories were given, "and the inherent coerciveness of the confession as given." *Hunter*, 332 F. App'x at 288. (quoting *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992)); *Jackson v. McKee*, 525 F.3d 430, 433 (6th Cir. 2008). The Supreme Court has yet to distill this doctrine into a "comprehensive set of hard rules," with the exception of a prohibition against physical coercion. *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017), cert. denied, 138 S. Ct. 2677 (2018).

Allegations that a confession was coerced from a juvenile require "special care," including a focus on "whether a friendly adult is present for or consents to the interrogation." *Id.* at 305. The Seventh Circuit recently confronted a similar situation in *Dassey*. *Id. Dassey* arose out of the 2005 rape and murder of Theresa Halbach. *Id* at 300. During the investigation of Halbach's disappearance, sixteen year old Brendan

35

Dassey confessed to the murder after several interviews, over several days. *Id.* In the *Dassey* habeas corpus appeal, Dassey alleged that his confession was unconstitutionally coerced and the Seventh Circuit was tasked with deciding whether the state court's decision to uphold Dassey's conviction "was based on an unreasonable application of Supreme Court precedent or an unreasonable view of the facts." *Id.* at 301. The Seventh Circuit applied the totality of the circumstances analysis and concluded that Dassey's confession was lawfully obtained under the clearly established Supreme Court precedent of the time. *Id.* at 318. The case law discussed in *Dassey* and the Seventh Circuit's application of such law to Dassey's circumstances are instructive.

### i.    *The Halbach/Dassey Investigation*

After Halbach's vehicle and charred remains were found on the property of Dassey's uncle, Steven Avery, in October 2005, investigators interviewed Avery's family. Dassey was interviewed for an hour in November 2005 and stated that he had seen Halbach taking pictures on the Avery's property. *Id.* at 306. Dassey "resisted the suggestion that [Halbach] had entered Avery's home." *Id.* Dassey was interviewed again three months later after investigator's learned he had been "crying uncontrollably and had lost about forty pounds of weight." *Id.*

Dassey was interviewed three times over one day. *Id.* at 306. Dassey signed a *Miranda* waiver and his mother consented to, but did not sit in on, the interviews. *Id.* Dassey said that he walked to Avery's trailer around 9:00 p.m. to help with a bonfire

36

and saw human body parts in the fire. *Id.* Dassey was asked about a pair of bleach stained jeans, and admitted he helped clean up the garage floor that night. *Id.* He denied involvement in Halbach's murder. *Id.*

For the third interview, investigators again obtained permission from Dassey's mother. *Id.* Investigators picked up Dassey from school, drove him to his home to retrieve the bleach-stained jeans, and then to the local sheriff's department, chatting throughout the drive. *Id.* Investigators read Dassey his *Miranda* rights and had Dassey sign a waiver form. *Id.* At the sheriff's department, he "confirmed that he understood his *Miranda* rights and still wanted to talk." *Id.* Dassey was interviewed over three hours without a friendly adult, and was offered food, drinks, bathroom breaks, and the opportunity to rest. *Id.*

The interview began with an investigator telling Dassey they needed information to "tighten up" previous accounts," followed by reassurances they were "on [his] side." *Id.* Dassey expressed concern that he might be arrested, but investigators urged him to "tell the whole truth, don't leave anything out." *Id.* Dassey provided significant details about the murder and rape, but kept changing the details and sequence of events. *Id.* at 307-08. Investigators eventually asked leading questions, such as, "Who shot her in the head?" *Id.* at 308.

Dassey was given a break and after the break he asked if he would make it back to school in time to turn in a project. *Id.* Dassey continued to give a confusing and

37

contradictory account of the murder so investigators tested his suggestibility by asking him about false details, which Dassey correctly denied. *Id*. at 309. Dassey was then given another break to eat and sleep. *Id*. Investigators then informed Dassey that he was going to be arrested, another concept that he did not fully grasp. *Id*. Dassey's mother came and spoke to him. *Id*. at 310. When she asked him whether he had done anything to Halbach, he replied, "Not really," and told her "they got to my head." *Id*.

Dassey was arrested, charged, and tried for Halbach's murder. *Id*. At trial, he unequivocally denied his prior statements, testifying that he had no knowledge or involvement in the murder. *Id*. The confession was admitted over Dassey's objection, with the Wisconsin state court finding it was voluntarily given. *Id*. In reaching that decision, the state court judge considered Dassey's age, his low average IQ, his special education assistance, his lack of a criminal record, the non-custodial nature interviews, and his mother's consent to the interviews. *Id*. at 310-11. In regards to the investigators, the judge discussed how they had never raised their voices with Dassey, they made no threats against him, that Dassey was never frightened or intimidated by them, that Dassey never asked them for his mother or a lawyer, that they used false information to interrogate him, and that they never made any "frank promises of leniency." *Id*.

After appeals in the state court failed to demonstrate the interviews were coercive, Dassey sought federal habeas relief. *Id*. at 311-12. The Seventh Circuit eventually took up the issue.

38

### ii.    The Seventh Circuit's Analysis – Dassey Voluntarily Confessed

As discussed by the Seventh Circuit, the Supreme Court's direction as to coercive tactics is not always very clear. "[T]actics designed to exhaust suspects physically and mentally" are frowned upon, and specific tactics, like "long interrogation sessions or prolonged detention paired with repeated but relatively short questioning" have been specifically condemned. *Id.* at 304. Deceptive tactics have been allowed, such as "appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff." *Id.* (referring to *Procunier v. Atchley*, 400 U.S. 446, 453–54 (1971) and *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)). While non-specific false promises are not "*per se* coercion," but might be under some circumstances; officers are permitted "to tell a suspect that 'a cooperative attitude' would be to his benefit." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 727 (1979)). The only thing that is clear is that there is no "bright line" rule to follow. *Id.*

The Seventh Circuit applied the Supreme Court's direction on coercive tactics "alongside [the] particular vulnerabilities of the suspect," Dassey. *Id.* at 305. As part of this analysis, the court considered:

- that Dassey was young (sixteen years old),

- that he had an IQ level of low average to borderline range (an IQ in the low 80s),

39

- that he received some special education assistance with his classes,

- he was given "general assurances of leniency if he told the truth,"

- that he appeared to "not grasp the gravity of his confession,"

- that some leading and suggestive questions were posed to him,

- that no friendly adult was in the room,

- that he appeared to be guessing at times in responses to investigator's questions, and

- that he gave multiple different and contradictory accounts of the crime.

*Id.* at 312. While these factors could suggest an involuntary confession, the court held that there were several other significant factors to indicate the confession was voluntary, including:

- that Dassey was not in custody when he confessed,

- that he went with and spoke to investigators voluntarily,

- that his mother consented to the interviews,

- that he was given *Miranda* warnings and understood them,

- that he was interviewed in a comfortable environment,

- that he showed no signs of physical distress,

- that he had access to food, drinks, and bathroom breaks, and

- the relatively short length (three hours) of the interrogation.

*Id.* at 312-13.

40

The Seventh Circuit acknowledged the challenged investigation techniques used while interviewing Dassey. *Id.* at 313. The court upheld the investigators' use of deception, and their continued questioning and pressure when Dassey's story did not make sense. *Id.* The Court held that there was no "controlling Supreme Court precedent condemning the techniques used with Dassey." *Id.* at 318. The Court then reviewed similar cases involving juvenile confessions, *Boulden v. Holman*, 394 U.S. 478 (1969) (wherein an eighteen year old with a low IQ confessed after being interrogated late into the night, and his father and a lawyer were withheld from him), and *Fare v. Michael C.*, 442 U.S. 707 (1979) (wherein a sixteen year old confessed after officers made threats, promises of leniency, and refused his requests to stop the interrogation, leading him to cry), highlighting how the Supreme Court had found those confessions voluntary under worse conditions than Dassey faced. *Id.* at 314-15. Lastly, the Court explained why the factual inconsistencies and lack of solid corroborating physical evidence were not relevant to the inquiry of "voluntariness," but instead only to "reliability," i.e. that the Supreme Court had removed such considerations from the voluntariness inquiry in *Colorado v. Connelly. Id.* at 317-18.

The above analysis led the Seventh Circuit to conclude that it was reasonable to find Dassey's confession voluntary and it left his conviction undisturbed. *Id.* at 318.

41

### B.  Analysis – Plaintiff's Confessions were Voluntary

Plaintiff raises many of the same complaints as Dassey. He alleges that his two confessions were coerced by the Defendants through the application of unconstitutional interrogation techniques to his vulnerable fourteen year old self. Plaintiff raises several factors in his Complaint that he asserts prove his confessions were coerced. [*Complaint*, R. 1, Page ID 3, 13, 16-17]. These factors are:

*as to both officers,*

(1)   That he was young, at only fourteen years old, [*Complaint*, R. 1, Page ID 3, ¶ 6];

(2)   That he was learning disabled, i.e. illiterate and blind in one eye, [*Id.*];

(3)   That he was high during the first interview from smoking marijuana, [*Id.* at Page ID 13, ¶ 56];

(4)   That he was relentlessly interrogated, [*Id.* at Page ID 3, ¶ 6];

(5)   That he was interrogated without a parent or guardian present, [*Id.*];

(6)   That the Defendants threatened him, [*Id.* at ¶ 7];

(7)   That the Defendants made false promises, [*Id.*];

(8)   That he was interrogated at night, [*Id.* at Page ID 16, ¶ 67];

(9)   That he was interrogated without a chance to sleep, [*Id.* at ¶ 68];

(10) That his confessions were inconsistent and contained factual errors, [*Id.* at Page ID 17, ¶ 77];

42

*only as to Russell,*[5]

> (11) That Russell denied his request to go home, [*Id.* at Page ID 16, ¶ 67];
>
> (12) That Russell swore at him, calling him a "dumbass," [*Id.* at ¶ 73];
>
> (13) That Russell denied his request for an attorney, [*Id.*]; and
>
> (14) That Russell showed him photographs of the crime scene to manipulate him, [*Id.* at Page ID 17, ¶ 74].

The application of the totality of the circumstances test to the established facts, viewed even in a light most favorable to Plaintiff, reveals that Defendants are entitled to qualified immunity because (1) they did not coerce a confession from Plaintiff, and (2) clearly established law in 2007 did not notify a reasonable officer that the challenged conduct was unconstitutional.

### i.   *Plaintiff's Particular Vulnerabilities*

Plaintiff's confessions were not coerced by either Defendant. Following the same path of analysis as *Dassey*, it is prudent to address Plaintiff's specific vulnerabilities. First, Plaintiff's age is not the vulnerability he suggests. The evidence demonstrates only that Defendants knew Plaintiff was a street-savvy fourteen year old who had been walking outside alone after midnight in Detroit. [*Plaintiff's Deposition*, R. 148-2, Page ID 5959-5960, 5965; *Complaint*, R. 1, Page

---

[5] This distinction is significant because a defendant may only be liable for his individual conduct. *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991); *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).

43

ID 2; *Evidentiary Hearing*, R. 148-13, Page ID 6185]. Plaintiff's behavior and the statements from Plaintiff's "Uncle Bill Rice" convey a higher level of maturity and street smarts than an average fourteen year old. Plaintiff's willingness and ability to point out crime in the area supports this conclusion. [*Plaintiff's Deposition*, R. 148-2, Page ID 5972, 5974-5975].

Second, Plaintiff complains that, like Dassey, he had limited intelligence and was interrogated without a parent or guardian present. Also like Dassey, Plaintiff's grandmother and mother – two of the people arguably most familiar with Plaintiff's abilities – consented to his interviews. Plaintiff was present when consent was obtained, he heard why the officers said they wanted to speak with him, and his mother even told him to tell the truth despite Plaintiff telling her that he did not know anything. [*Plaintiff's Deposition*, R. 148-2, Page ID 5968-5969, 5989]. Plaintiff never asked for his mother or grandmother, or expressed that he was scared; Plaintiff can be seen smiling as he plays with the camera in the recorded confession. [*Video*, R. 148-14]. There is no evidence either woman informed the officers of Plaintiff's alleged limitations or that the officers otherwise knew of them. There is no evidence that would have even suggested to them that Plaintiff was intellectually disabled.

Moreover, the evidence demonstrates that Plaintiff was not intellectually challenged. Plaintiff had completed the Ninth grade and had an average/low average IQ. [*Id.* at Page ID 5948; *Report of Plaintiff's Expert Dr. Aaron,* R. 170-23, Page ID

44

9164]. Plaintiff's alleged "learning disability" was behavioral issues, he was never diagnosed with a learning disability as Plaintiff's expert acknowledges in a footnote. [*Report of Plaintiff's Expert Dr. Aaron,* R. 170-23, Page ID 9164]. After he was arrested for the Runyon murders, he underwent two forensic psychological evaluations that noted he "exhibit[ed] clear thinking, good abstraction, and adequate understanding of relevant legal constructs. The evaluator offered an impression of average cognitive ability, which was consistent with prior cognitive assessment." [*Id.* at Page ID 9165]. His ability to use a computer – without assistance – to browse several websites is another indicator of the intellectual abilities he displayed to Defendants. [*Plaintiff's Deposition*, R. 148-2, Page ID 5982].

Third, Plaintiff complains that he was interrogated at night for a protracted period of time. Both times Plaintiff was interviewed, it was done voluntarily and Plaintiff was never in handcuffs. [*Id.* at Page ID 5996-5997, 6006, 6016]. He was given food, as well as several breaks. [*Id.* at Page ID 5982, 5987, 6015-6016]. He was allowed to sleep before signing the first confession. [*Id.* at Page ID 5987-5988]. He then went home and slept before the second interview. [*Id.* at Page ID 5988]. Plaintiff was not deprived of sleep, nor did his interviews last an unreasonable amount of time. See *Ledbetter v. Edwards*, 35 F.3d 1062, 1068 (6th Cir. 1994) (approving an interrogation from 11:30 a.m. to 6:00 a.m.); *Brown v. Jackson*, 501 Fed. Appx. 376, 379 (6th Cir. 2012) (concluding that a 51 hour detention was not coercive).

45

Fourth, Plaintiff complains that he was high during his first interview. He abandoned this argument by not addressing it in the District Court. [*Plaintiff's MSJ Response*, R-170]. Additionally, the evidence demonstrates that Plaintiff told Russell, during his first confession, that he had smoked marijuana earlier that day, well before the homicide. [*1st Statement*, R. 148-17, Page ID 6212]. There was no evidence that Plaintiff told either officer he was high at the time he was interviewed or that they should have realized he was high. This should not be a factor in the analysis.

Fifth, Plaintiff alleges that the inconsistencies and factual errors in his confessions demonstrate the coerciveness of the interview. Like Dassey, though, he is incorrect. As the Seventh Circuit explained, reliability is not a measure of voluntariness.

### ii. Interrogation Techniques

Continuing in the pattern of the *Dassey* analysis, none of the interrogation techniques used were unconstitutional. First, Plaintiff alleged that Defendants threatened him. There is no evidence of any threats. Second, Plaintiff alleged that Defendants made false promises. There is no evidence of any promise made by Tolbert. The only evidence in the record to support this allegation is that Russell told Plaintiff he would get to go home if he gave a truthful statement. Such statements are not coercive or unconstitutional. See *United States v. Kilgore*, 58 F.3d 350, 353

(8th Cir. 1995) (holding that a confession was voluntary despite promises that the interrogee would not go to jail that evening); *United States v. Liu*, 2008 W.L. 1994975, at *2, 4 (D. Minn., May 5, 2008), (holding that a confession was voluntary despite police officers stating that he would not spend the night in jail if he cooperated); *United States v. Campas*, 2014 W.L. 3887881, at *7, 10 (D. Ariz., August 7, 2014), (denying a motion to suppress where the officer promised that the interrogee could go home if he cooperated).

Plaintiff was read his *Miranda* rights, signed a waiver, and understood the consequences of his statements. [*Miranda Waiver*, R-148-18, Page ID 6216; *Arraignment*, R. 148-25, Page ID 6245; *12-19-07 Competency Hearing*, R. 148-27, Page ID 6265-6268; *Dr. Schwartz Deposition*, R. 148-26, Page ID 6251-6253; *Order on Competency*, R. 148-28, Page ID 6270]. This is also not the first time Plaintiff had to deal with the consequences of his actions as he had prior experience with the criminal justice system from two previous arrests. [*Plaintiff's Deposition*, R-148-2, Page ID 5953-5954]. Plaintiff was never in custody or handcuffed, and voluntarily participated in the interviews. He never told Russell he wanted to leave or did not want to speak. There is no evidence that Russell's alleged promise was coercive.

Plaintiff next complains that Russell swore at him, calling him a "dumbass," and a liar. These statements are not coercive. The act of swearing itself has not been held to be coercive. See *United States v. Twiddy*, 2007 W.L. 3256649, at *7 (D. Colo.,

47

November 2, 2007); *United States v. Ohayon*, 2012 W.L. 13070065, at *14 (D. N.M., September 19, 2012); *United States v. Flowers*, 2005 W.L. 1799195, at *2 (D. Kan., June 17, 2005). Nor was calling Plaintiff a liar coercive, especially given that Plaintiff admitted he was lying. As discussed in *Dassey*, it is not coercive to press a suspect when their statements do not make sense. *Dassey*, 877 F.3d at 317-318.

Lastly, Plaintiff complains that Russell showed him photographs of the bodies at the scene. This act was not unconstitutional and, as of 2007, there had been no case concluding that it was. See *Dassey*, 877 F.3d at 317 (holding that a confession was not coerced despite "the investigators prodding and interjecting critical facts into the discussions that corroborated evidence they already knew."); *Williams v. Horel*, 341 Fed. App'x. 333, 336 (9th Cir. 2009) ("there is no Supreme Court precedent that would require [the Court] to find suggestive or persistent questioning to be coercive."); *United States v. Sanchez*, 614 F.3d 876, 885 (8th Cir. 2010) (holding that showing suspect photographs was not inherently coercive); *Lopez v. Zenon*, 390 Fed. App'x. 786, 790 (10th Cir. 2010) (holding that it was not coercive to show suspect "grisly" photographs of victim).

### iii.    *Totality Analysis*

Consideration of Plaintiff's alleged vulnerabilities in combination with these alleged interrogation techniques do not support Plaintiff's claim that he was coerced into confessing. Plaintiff was a street savvy fourteen year old that voluntarily went

48

with the officers after consent was obtained from his grandmother and mother. There is no evidence that Russell or Tolbert knew, or should have known that he was intellectually disabled. There is no evidence Plaintiff was so intellectually disabled that he did not understand the consequences of his actions. The environment of Plaintiff's interrogation was not coercive – he was given breaks, fed, and allowed to sleep. Certainly no case law existed that would have put Defendants on notice that their acts were unconstitutional as of September 2007.

Specifically as to Tolbert, there is no evidence he exhibited any coercive behavior. Tolbert was only briefly involved in the second interview. [*Plaintiff's Deposition*, R-148-2, Page ID 6014]. During the second interview, after Russell showed Plaintiff the pictures, Tolbert and other officers entered the interview space. [*Id.* at Page ID 6013-6015]. They asked him questions, took a break to talk amongst themselves, and then Tolbert drew a sketch of the living room and had Plaintiff draw the location of the bodies. [*Id.* at 6015]. Tolbert had Plaintiff sign the sketch, then left. [*Id.* at Page ID 6019-6020]. This was the extent of Tolbert's conduct. There are no facts upon which Plaintiff can support his claim of coercion in that short interaction – an interaction that Plaintiff admits last only a couple of minutes. [*Id.* at Page ID 6016]. Because nothing about Tolbert's conduct was so coercive that it can be said to have overborne Plaintiff's will, Tolbert should be granted qualified immunity.

49

Russell is likewise entitled to qualified immunity. Russell's conduct, when examined as a whole, does not raise a question as to whether it could be said to overbear Plaintiff's will. Nothing about the environment, personal characteristics of Plaintiff, or interview techniques indicates that, as of September of 2007, Russell's actions violated clearly established precedent. No case law would have informed a reasonable officer in 2007 that it was unconstitutional to interview a purportedly street-savvy fourteen year old found walking the streets at night after receiving permission from his grandmother and mother. No case law would have informed a reasonable officer that it was unconstitutional to tell a fourteen year old he was lying when he admits he was lying, or to show him photographs of the victims at the center of the crime he was lying about. Russell's conduct while interviewing Plaintiff did not violate clearly established law.

## IV.   MALICIOUS PROSECUTION

Plaintiff's final claim is that he was maliciously prosecuted in violation of his Fourth Amendment rights, and is brought against both defendants. To support a malicious prosecution claim, Plaintiff must establish four elements: (1) that a criminal prosecution was initiated against him and the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that as a consequence of a legal proceeding, he suffered a deprivation of liberty under the Fourth Amendment, apart from the initial seizure, and

50

(4) that the criminal proceeding was resolved in his favor. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).

Defendants raised qualified immunity in response to this claim. Plaintiff cannot establish that a constitutional violation occurred because he cannot satisfy any of the four required elements.

## A.    Decision to Prosecute – Defendants were not Involved

A plaintiff must show that the defendant made, influenced, or participated in the decision to prosecute him. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). This must be independent of any testimony, as witnesses, including police officers, are entitled to absolute immunity for their testimony and associated preparatory activities. *King v. Harwood*, 852 F.3d 568, 584-86 (6th Cir. 2017) (relying on *Rehberg v. Paulk*, 566 U.S. 356 (2012). This requires a plaintiff to demonstrate that the defendant influenced the decision to prosecute "prior to, and independent of, his [] testimony." *Id.* at 586. Thus, a plaintiff must show that an officer's knowing misstatements and falsehoods in investigatory material influenced the decision to prosecute him. *Sykes*, 625 F.3d at 315.

Here, Plaintiff cannot establish that Defendants influenced the decision to prosecute him outside of their testimonial activities. There is no evidence that either spoke to the prosecutor that made the charging decision. There is only evidence of communication between Russell and a prosecutor in relation to, and during, his

51

testimony at the preliminary examination and trial. Tolbert did not testify during those proceedings. No matter the time frame though, both Defendants are entitled to absolute immunity for their testimony and any preparatory conversations they may have had in relation there to. Thus, Plaintiff's claim must be supported by their non-testimonial acts.

The non-testimonial act Plaintiff has alleged to support this claim is the fabrication of the sketch. [See *Plaintiff's MSJ Response*, R-170, Page ID 8355]. As discussed above, the sketch is not fabricated and does not, itself, contain any misrepresentations that form the basis for liability. Plaintiff believes that Russell can also be liable for this action as part of a conspiracy. However, since Defendants are part of the same municipal corporation, they cannot conspire together. *Jackson v. City of Cleveland*, 925 F.3d 793, 818 (6th Cir. 2019). Thus, there is no basis to hold that either Defendant made, influenced, or participated in the decision to prosecute.

## B.    Probable Cause – Independently Established

A plaintiff cannot maintain a malicious prosecution claim if there is probable cause to prosecute regardless of the alleged false statements made by an investigator at a probable cause hearing. *McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005). An officer has probable cause when there is a "fair probability" that the individual has committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001).  Probable cause can be established by lying and evasive

52

behavior, *D.C. v. Wesby*, 138 S. Ct. 577, 587-588 (2018), having gunshot residue on one's person, *Liapes v. Nye Co., Nevada*, 2015 W.L. 6598737, at *1 (D. Nev., October 28, 2015), trying to launder clothes, *id.*, and identification of a suspect's voice, *Castro v. Co of Nassau*, 739 F. Supp. 2d 153, 166 (E.D. N.Y. 2010).

There was probable cause to charge and prosecute Plaintiff with crimes related to the Runyon Street murders, independent of any wrongful acts by Defendants. Probable cause existed based on the following:

- Russell encountered Plaintiff soon after a quadruple homicide occurred near Plaintiff's house and a canine track led officers to Plaintiff's street, near his house;

- the shoes Plaintiff told officers he was wearing that night were found in the washing machine with blood-like stains;

- the suspects were wearing black and Sanford's black pants had gunshot residue on them;

- the surviving victim described the suspect's voice as young and later testified that his voice was consistent with Plaintiff's voice;

- Plaintiff admitted to being involved in the planning of Milk Dud's murder during the first encounter with the police and identified others such as Tone, Tone Tone and Los; and,

- Plaintiff admittedly lied to Russell.

These facts sufficiently establish probable cause to support Plaintiff's arrest and prosecution. Thus, Plaintiff's malicious prosecution claim fails.

53

### C.      Deprivation of Liberty - The Guilty Plea Bar

Plaintiff cannot establish that he suffered a deprivation of liberty as a result of the criminal proceedings because he entered an unconditional guilty plea. That plea was the cause of Plaintiff's deprivation of liberty. Moreover, as discussed above in Section (I)(B)(i)(b), Plaintiff's guilty plea renders him unable to challenge this pre-plea deprivation of his constitutional rights. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *Werth v. Bell*, 692 F.3d 486, 495 (6th Cir. 2012).

### D.      Favorable Termination – On-Going Investigation

Plaintiff did not achieve a favorable termination when his criminal proceedings were dismissed *without prejudice*. The Supreme Court recently confirmed that the favorable termination element requires that a criminal conviction must be "invalidated within the meaning of *Heck [v. Humphrey]*." *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019).

To qualify as a favorable termination, the criminal prosecution must be terminated in a manner where the criminal defendant was found "not guilty" or "innocent." See *Dunn v. State of Tenn.*, 697 F.2d 121, 127 n.8 (6th Cir. 1982), see also Restatement (Second) of Torts § 658(c) (1977). A dismissal without prejudice does not satisfy the favorable termination element. *Thorp v. D.C.*, 142 F. Supp. 3d 132, 145 (D. D.C., 2015); *Craft v. Billingslea*, 2017 W.L. 6039559, at \*5 (E.D. Mich., December 6, 2017); *Leslie v. City of Detroit*, 2018 W.L. 1510636, at \*6 (E.D. Mich., March 26,

54

2018). "Where the case is disposed of in a manner that leaves the question of the accused's innocence unresolved, there generally can be no malicious prosecution claim by the accused," even if the case is dismissed ***with prejudice*** or if the dismissal was because of a key witness's credibility. *M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016).

Plaintiff's criminal case was dismissed without prejudice and does not satisfy the favorable termination element. [*Opinion re: Criminal Case Dismissal*, R. 148-74, Page ID 6586]. In his opinion granting the dismissal, Judge Sullivan highlighted how many unanswered questions remained in the case, leaving Plaintiff's guilt an open issue. [*Id.* at Page ID 6583-6584]. The judge noted that the case was being dismissed because tainted evidence extended too deep into the case, and "[t]hat taint appears to extend to both sides." [*Id.* at Page ID 6586].

Plaintiff surrendered his claim to innocence when he pled guilty. When Plaintiff pled guilty, he did not maintain his innocence while accepting the plea, as permitted under *North Carolina v. Alford*, 400 U.S. 25, 32 (1970). Plaintiff not only admitted his guilt during his plea hearing, he went further and swore to a third version of the crime during the plea hearing. [*Trial Day 2,* R. 148-34, Page ID 6382-6397]. By not entering an *Alford* plea, Plaintiff lost his claim to innocence.

This Court's recent opinion in *Peterson v. Heymes, et. al.*, highlights the requirement that a conviction be invalidated through innocence. *Peterson v. Heymes*,

No. 17-2270, 2019 WL 3330456, at *2 (6th Cir. July 25, 2019). In *Peterson*, the plaintiff was convicted of sexual assault and murder in 1996. Peterson confessed after nine interrogations during which he alleged he was severely depressed, suffering from brain damage and mental illness, fed details of the crime, and given false promises of leniency. *Id.* at *2. After Peterson confessed, a DNA test confirmed that Peterson was not a match for the semen sample taken from the victim. *Id.* DNA tests could not rule Peterson out as a match to the DNA from the victim's shirt though, as technology at the time was too limited; thus, Peterson remained in prison. *Id.*

When DNA testing methods improved, Peterson was conclusively ruled out as a match for the DNA on the victim's shirt. *Id.* The charges against Peterson were dismissed because he was conclusively ruled out as the perpetrator. *Id.* When Peterson filed his Section 1983 lawsuit, the defendants argued that he was collaterally estopped from litigating the voluntariness of his confession. *Id.* This Court held that Plaintiff was not collaterally estopped because the state court conviction was invalidated when the case was dismissed due to the DNA evidence. *Id.*

Plaintiff's dismissal is different. Plaintiff's guilt remains an open question that is still under investigation. Plaintiff's shoes seized during the investigation contained stains that look like blood. [*MSJ Reply*, R. 172-7, Page ID 10156-10159]. The Michigan State Police recently conducted a test confirming that human DNA from multiple sources exists on Plaintiff's shoes. [*MSP Test Results*, R. 320-6, Page ID 15884-15885].

56

The DNA evidence from the shoes is being sent to a lab for comparison to the DNA from the five victims. [*Withdrawal of Motion re: Limited Discovery*, R. 336, Page ID 16380]. Given that questions regarding Plaintiff's innocence still loom large, he cannot satisfy the favorable termination requirement.

## RELIEF SOUGHT

For the reasons expressed above, Defendants request that this Court reverse the District Court's decision and grant them dismissal under the doctrine of qualified immunity.

Respectfully submitted,
**SEWARD HENDERSON PLLC**

/s/ T. Joseph Seward (P35095)
*Attorneys for Defendants Russell and Tolbert*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248)73303633
E: jseward@sewardhenderson.com

Dated:  September 4, 2019

## CERIFICATE OF COMPLIANCE

I certify that Appellant's brief complies with the type-volume limitation in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. The brief contains

12,998 words, excluding the contents exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

I further certify that Appellant's brief complies with the typeface requirement in Rule 32(a)(5) of the Federal Rules of Appellate Procedure. I prepared the brief in Microsoft® Word 2013 and used Times New Roman, a proportionally-spaced font, at 14 point.

Respectfully submitted,
**SEWARD HENDERSON PLLC**

/s/ T. Joseph Seward (P35095)
*Attorneys for Defendants Russell and Tolbert*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248)73303633

Dated:  September 4, 2019                    E: jseward@sewardhenderson.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2019, I electronically filed the foregoing brief with the Clerk of the Court, which will send notification to the following: *All Attorneys of Record*.

**SEWARD HENDERSON PLLC**

/s/Alexandra R. Lazarow
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248)73303633

Dated:  September 4, 2019                    E: admin-asst@sewardhenderson.com

58

**APPENDIX**

## DESIGNATION OF RELEVANT DISTRICT COURT FILINGS

| Description | Docket | Page ID |
|---|---|---|
| **Complaint** | **1** | **1-47** |
| **Defendants', Detroit's, Russell's, and Tolbert's Motion to Dismiss** | **36** | **411-645** |
| Index of Exhibits | 36-1 | 460-461 |
| Ex. 1 – Preliminary Hearing Transcript | 36-2 | 462-471 |
| Ex. 2 – Criminal Proceedings Register of Actions | 36-3 | 472-487 |
| Ex. 3 – Competency Hearing | 36-4 | 488-491 |
| Ex. 4 – Bench Trial Transcript Day 1 | 36-5 | 492-499 |
| Ex. 5 – Bench Trial Transcript Day 2 | 36-6 | 500-521 |
| Ex. 6 – Sentencing Transcript | 36-7 | 522-524 |
| Ex. 7 – Michigan Court of Appeals Opinion | 36-8 | 525-536 |
| Ex. 8 – Michigan Supreme Court Opinion | 36-9 | 537-538 |
| Ex. 9 – *Barmapov v. Barry*, 2011 W.L. 32371 (E.D. N.Y. 2011) | 36-10 | 539-545 |
| Ex. 10 – *Fox v. Michigan State Police Dept.*, 173 Fed. Appx. 372 (6th Cir. 2006) | 36-11 | 546-552 |
| Ex. 11 – *Davis v. Muncy*, 976 F.2d 733 (6th Cir. 1992) | 36-12 | 553-555 |
| Ex. 12 – *Bynum v. City of Oklahoma City*, 2005 W.L. 1241893 (W.D. Okla. 2005) | 36-13 | 556-557 |
| Ex. 13 – *Bynum v. City of Oklahoma City*, 204 Fed. Appx. 767 (10th Cir. 2006) | 36-14 | 558-561 |
| Ex. 14 – *Brown v. City of Detroit*, 47 Fed. Appx. 339 (6th Cir. 2002) | 36-15 | 562-565 |

59

| | | |
|---|---|---|
| Ex. 15 – *United States v. Dossey*, 66 Fed. Appx. 528 (6th Cir. 2003) | 36-16 | 566-570 |
| Ex. 16 – *Howard v. Burt*, 2017 W.L. 3425900 (E.D. Mich. 2017) | 36-17 | 571-575 |
| Ex. 17 – *Jarrett v. Township of Bensalem*, 312 Fed. Appx. 505 (3rd Cir. 2009 | 36-18 | 576-580 |
| Ex. 18 – *Mote v. City of Chelsea*, 2018 W.L 262855 (E.D. Mich. 2018) | 36-19 | 581-603 |
| Ex. 19 – *Clemons v. Gaines*, 2007 WL 4547862 (E.D. Mich. 2007) | 36-20 | 604-610 |
| Ex. 20 – *Neal v Anspaugh-Kisner*, 2008 WL 506336 (E.D. Mich. 2008) | 36-21 | 611-620 |
| Ex. 21 – *Fitts v. Burt*, 2008 WL 842705 (E.D. Mich. 2008) | 36-22 | 621-628 |
| Ex. 22 – *Skinner v. Unknown Grandson*, 2006 WL 1997392 (E.D. Mich. 2006) | 36-23 | 629-641 |
| Ex. 23 – *Siner v. City of Detroit*, 2017 W.L. 1190946 (E.D. Mich. 2017) | 36-24 | 642-645 |
| **Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss** | **51** | **1101-1149** |
| Ex. A – Michigan Court of Appeals Annual Report for 2014 | 51-1 | 1144-1149 |
| **Defendants' Reply Brief to Plaintiff's Response to Their Motion to Dismiss** | **58** | **1538-1870** |
| Index of Exhibits | 58-1 | 1553 |
| Ex. 1 – Crim. Ct. Op. 7/19/16 | 58-2 | 1554-1561 |
| Ex. 2 – *Craft v. Billingslea* | 58-3 | 1562-1568 |
| Ex. 3 – *Leslie v. City of Detroit* | 58-4 | 1569-1575 |
| Ex. 4 – *Barmapov v. Barry* | 58-5 | 1576-1582 |
| Ex. 5 – Preliminary Hearing Trans | 58-6 | 1583-1646 |

| | | |
|---|---|---|
| Ex. 6 – Trial Trans. Day 1 | 58-7 | 1647-1709 |
| Ex. 7 – Trial Trans, Day 2 | 58-8 | 1710-1798 |
| Ex. 8 – Comp. Hearing Trans | 58-9 | 1799-1812 |
| Ex. 9 – Comp. Report | 58-10 | 1813-1823 |
| Ex.10 – Statement 1 | 58-11 | 1824-1827 |
| Ex. 11 – Statement 2 | 58-12 | 1828-1830 |
| Ex. 12 – Sketch | 58-13 | 1831-1832 |
| Ex. 13 – Opinion | 58-14 | 1833-1834 |
| Ex. 14 – *Grise v. Allen* | 58-15 | 1835-1845 |
| Ex. 15 – *United States v Stewart* | 58-16 | 1846-1848 |
| Ex. 16 – *Lanza v. City of Chicago* | 58-17 | 1849-1854 |
| Ex. 17 – Reg. Action | 58-18 | 1855-1870 |
| **Amended Case Management and Scheduling Order** | **73** | **2165-2166** |
| **Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss** | **142** | **5843-5868** |
| **Defendants' Motion for Summary Judgment** | **148** | **5890-6586** |
| Index of Exhibits | 148-1 | 5942-5945 |
| Ex. 1 – D. Sanford | 148-2 | 5946-6041 |
| Ex. 2 – Det. Pub. Schl. Recs | 148-3 | 6042-6043 |
| Ex. 3 – DPS IQ Results | 148-4 | 6044-6048 |
| Ex. 4 – MDOC Rec | 148-5 | 6049-60-56 |
| Ex. 5 – 7/13/10 Ev. Hearing | 148-6 | 6057-6076 |
| Ex. 6 – 10/28/09 Ev. Hearing | 148-7 | 6077-6085 |
| Ex. 7 – 11-16-10 Ev. Hearing | 148-8 | 6086-6091 |
| Ex. 8 – M. Russell | 148-9 | 6092-6099 |
| Ex. 9 – Trial Day 1 | 148-10 | 6100-6162 |
| Ex. 10 – 1st Consent Form | 148-11 | 6163-6164 |

| | | |
|---|---|---|
| Ex. 11 – Prelim | 148-12 | 6165-6180 |
| Ex. 12 – 07/21/09 Ev. Hearing | 148-13 | 6181-6191 |
| Ex. 13 – Video of Interview with Sanford (Video) | 148-14 | 6192 |
| Ex. 14 – Video Trans | 148-15 | 6193-6207 |
| Ex. 15 – 2nd Statement | 148-16 | 6208-6210 |
| Ex. 16 – 1st Statement | 148-17 | 6211-6214 |
| Ex. 17 – 1st Miranda form | 148-18 | 6215-6216 |
| Ex. 18 – Identified Pictures | 148-19 | 6217-6221 |
| Ex. 19 – T. Sanford | 148-20 | 6222-6227 |
| Ex. 20 – J. Tolbert | 148-21 | 6228-6231 |
| Ex. 21 – Sketch | 148-22 | 6232-6233 |
| Ex. 22 – 2nd Miranda Form | 148-23 | 6234-6236 |
| Ex. 23 – Felony Warrant | 148-24 | 6237-6243 |
| Ex. 24 – Arraignment | 148-25 | 6244-6248 |
| Ex. 25 – L. Schwartz | 148-26 | 6249-6262 |
| Ex. 26 – Competency Hearing | 148-27 | 6263-6268 |
| Ex. 27 – Order on Miranda Competency | 148-28 | 6269-6270 |
| Ex. 28 – Register of Actions | 148-29 | 6271-6286 |
| Ex. 29 – P. Muscat | 148-30 | 6287-6292 |
| Ex. 30 – Amended Notice of Rebuttal to Defense of Alibi | 148-31 | 6293-6294 |
| Ex. 31 – Canceled Trial | 148-32 | 6295-6309 |
| Ex. 32 - Order on Trial Competency | 148-33 | 6310-6311 |
| Ex. 33 –Trial Day 2 | 148-34 | 6312-6401 |
| Ex. 34 – Settlement Offer | 148-35 | 6402-6403 |
| Ex. 35 – Gunshot Residue Results | 148-36 | 6404-6405 |
| Ex. 36 – D. Sanford MSP Interview Transcript | 148-37 | 6406-6412 |

62

| | | |
|---|---|---|
| Ex. 37 – Presentencing Report | 148-38 | 6413-6414 |
| Ex. 38 – Sentencing | 148-39 | 6415-6417 |
| Ex. 39 – People v Smothers Supp. Hearing | 148-40 | 6418-6425 |
| Ex. 40 – 3/16/10 Ev. Hearing | 148-41 | 6426-6432 |
| Ex. 41 – I. Todd | 148-42 | 6433-6443 |
| Ex. 42 – People v Smothers Prelim. | 148-43 | 6444-6447 |
| Ex. 43 – Smothers Written Statement | 148-44 | 6448-6450 |
| Ex. 44 – Smothers Video Confession (Video) | 148-45 | 6451 |
| Ex. 45 – V. Smothers Confession Trans | 148-46 | 6452-6454 |
| Ex. 46 – 5/13/10 Ev. Hearing | 148-47 | 6455-6459 |
| Ex. 47 – V. Smothers | 148-48 | 6460-6463 |
| Ex. 48 – Promenade Search Warrant | 148-49 | 6464-6466 |
| Ex. 49 – Smothers Warrant Request | 148-50 | 6467-6469 |
| Ex. 50 – Purchase Order | 148-51 | 6470-6471 |
| Ex. 51 – 4/27/11 Ev. Hearing | 148-52 | 6472-6476 |
| Ex. 52 – Motion to Withdraw Plea | 148-53 | 6477-6479 |
| Ex. 53 – 1/7/09 Hearing re: Motion to Withdraw Plea | 148-54 | 6480-6484 |
| Ex. 54 – Motion for Discovery of Exculpatory Materia | 148-55 | 6485-6487 |
| Ex. 55 – 2/27/09 Motion Hearing | 148-56 | 6488-6491 |
| Ex. 56 – App. Leave to Appeal | 148-57 | 6492-6496 |
| Ex. 57 – COA Order Remanding | 148-58 | 6497-6498 |
| Ex. 58 – People v Rice, et al Guilty Plea | 148-59 | 6499-6504 |
| Ex. 59 – W. Dandridge | 148-60 | 6505-6513 |
| Ex. 60 – D. Balash | 148-61 | 6514-6516 |
| Ex. 61 – Ruger Mini 14 Varieties | 148-62 | 6517-6516 |
| Ex. 62 – Ruger Mini Thirty Specs. | 148-63 | 6520-6523 |

| | | |
|---|---|---|
| Ex. 63 – Ruger Mini Thirty Production Years | 148-64 | 6524-6526 |
| Ex. 64 – 7/25/11 Ev. Hearing | 148-65 | 6527-6528 |
| Ex. 65 – E. Davis | 148-66 | 6529-6531 |
| Ex. 66 – 2012 Op. & Order | 148-67 | 6532-6562 |
| Ex. 67 – Motion for Relief from Judgment | 148-68 | 6563-6565 |
| Ex. 68 – Letter from Wayne County to Michigan State Police | 148-69 | 6566-6567 |
| Ex. 69 – C. Corriveau | 148-70 | 6568-6570 |
| Ex. 70 – Tolbert MSP Interview (Audio) | 148-71 | 6571 |
| Ex. 71 – Tolbert MSP Interview Trans | 148-72 | 6572-6574 |
| Ex. 72 – Stip. to Dismiss | 148-73 | 6575-6578 |
| Ex. 73 – 2016 Op. & Order | 148-74 | 6579-6586 |
| **Plaintiff's Response in Opposition to Motion for Summary Judgment** | **170** | **8321-10032** |
| Index of Exhibits | 170-1 | 8366-8368 |
| Ex. 1 – First Statement | 170-2 | 8369-8372 |
| Ex. 2 – Second Statement | 170-3 | 8373-8375 |
| Ex. 3 – Crime Scene Sketch | 170-4 | 8376-8377 |
| Ex. 4 – Vincent Smothers Deposition Transcript | 170-5 | 8378-8400 |
| Ex. 5 – Detroit Police Department Reports re: Runyon Quadruple Homicide | 170-6 | 8401-8756 |
| Ex. 6 – Valerie Glover Deposition Transcript | 170-7 | 8757-8770 |
| Ex. 7 – Vincent Smothers Affidavit, dated 03/06/15 | 170-8 | 8771-8797 |
| Ex. 8 – James Tolbert Deposition Transcript | 170-9 | 8798-8863 |
| Ex. 9 – Trial Transcript – Day 1, dated 03/17/08 | 170-10 | 8864-8905 |
| Ex. 10 – Evidentiary Hearing Transcript, dated 07/13/10 | 170-11 | 8906-8933 |
| Ex. 11 – Davontae Sanford Deposition Transcript | 170-12 | 8934-8988 |

64

| Ex. 12 – Plaintiff's Interrogatory Responses, dated 02/16/18 | 170-13 | 8989-8993 |
|---|---|---|
| Ex. 13 – Ernest Davis Deposition Transcript | 170-14 | 8994-9001 |
| Ex. 14 – Dale Collins MSP Interview | 170-15 | 9002-9006 |
| Ex. 15 – Davontae Sanford Declaration | 170-16 | 9007-9011 |
| Ex. 16 – Taminko Sanford Consent Form | 170-17 | 9012-9013 |
| Ex. 17 – Davontae Sanford MSP Interview | 170-18 | 9014-9028 |
| Ex. 18 – Michael Russell MSP Interview, dated 11/03/15 | 170-19 | 9029-9038 |
| Ex. 19 – Preliminary Hearing Transcript, dated 10/01/07 | 170-20 | 9039-9078 |
| Ex. 20 – Michael Russell Deposition Transcript | 170-21 | 9079-9146 |
| Ex. 21 – Schwartz Competency Report | 170-22 | 9147-9157 |
| Ex. 22 – Expert Report of Dr. Jeffrey Aaron | 170-23 | 9158-9201 |
| Ex. 23 – Lynne Schwartz Deposition Transcript | 170-24 | 9202-9212 |
| Ex. 24 – Patrick Muscat Deposition Transcript | 170-25 | 9213-9231 |
| Ex. 25 – Trial Transcript – Day 2, 03/18/08 | 170-26 | 9232-9267 |
| Ex. 26 – Sentencing Transcript, dated 04/04/08 | 170-27 | 9268-9273 |
| Ex. 27 – Ira Todd Deposition Transcript | 170-28 | 9274-9301 |
| Ex. 28 – Gravier Search Warrant | 170-29 | 9302-9310 |
| Ex. 29 – Vincent Smothers Confession Transcript, dated 04/20/08 | 170-30 | 9311-9326 |
| Ex. 30 – Evidentiary Hearing Transcript, dated 05/13/10 | 170-31 | 9327-9336 |
| Ex. 31 – Walter Dandridge Deposition Transcript | 170-32 | 9337-9349 |
| Ex. 32 – Promenade Search Warrant | 170-33 | 9350-9354 |
| Ex. 33 – Stipulation of the Parties re: chemist Leonora Brun-Conti | 170-34 | 9355-9357 |
| Ex. 34 – Barbara Simon Deposition Transcript | 170-35 | 9358-9384 |

| | | |
|---|---|---|
| Ex. 35 – Motion to Withdraw Guilty Plea, dated 03/13/09 | 170-36 | 9385-9401 |
| Ex. 36 – Evidentiary Hearing Transcript, dated 07/21/09 | 170-37 | 9402-9454 |
| Ex. 37 – Letter from Wayne County Prosecutor Kym Worthy | 170-38 | 9455-9456 |
| Ex. 38 – Michigan State Police Report re: Runyon Reinvestigation | 170-39 | 9457-9571 |
| Ex. 39 – Christopher Corriveau Deposition Transcript | 170-40 | 9572-9602 |
| Ex. 40 – Crime Scene Sketch Compilation | 170-41 | 9603-9608 |
| Ex. 41 – James Tolbert MSP Interview | 170-42 | 9609-9613 |
| Ex. 42 – Michael Russell MSP Interview, dated 09/11/15 | 170-43 | 9614-9618 |
| Ex. 43 – Homicide Charge Request for Vincent Smothers and Ernest Davis | 170-44 | 9619-9624 |
| Ex. 44 – Vacatur and Dismissal Order | 170-45 | 9625-9629 |
| Ex. 45 – MDOC Record | 170-46 | 9630-9631 |
| Ex. 46 – Taminko Sanford Deposition Transcript | 170-47 | 9632-9639 |
| Ex. 47 – Expert Report of James Trainum | 170-48 | 9640-9730 |
| Ex. 48 – Gunshot Residue Report | 170-49 | 9731-9734 |
| Ex. 49 – Plea Form | 170-50 | 9735-9736 |
| Ex. 50 – Defendants' Response to Plaintiff's Fifth Requests for Production | 170-51 | 9737-9743 |
| Ex. 51 – Promenade Search Report | 170-52 | 9744-9746 |
| Ex. 52 – Michigan State Police Ballistics Chart | 170-53 | 9747-9748 |
| Ex. 53 – Vincent Smothers Michigan State Police Interview, dated | 170-54 | 9749-9756 |
| Ex. 54 – Opinion and Order Denying Defendant's Motion to Withdraw Guilty Plea | 170-55 | 9757-9786 |

66

| | | |
|---|---|---|
| Ex. 55 – Brief for Appeal of Denial of Motion to Withdraw Guilty Plea | 170-56 | 9787-9875 |
| Ex. 56 – Renewed Motion to Withdraw Guilty Plea, dated 03/13/09 | 170-57 | 9876-9892 |
| Ex. 57 – Expert Report of David Balash | 170-58 | 9893-9914 |
| Ex. 58 – Expert Report of Dr. Allison Redlich | 170-59 | 9915-9994 |
| Ex. 59 – Transcript of Hearing re Motion to Withdraw Guilty Plea, dated 01/07/09 | 170-60 | 9995-10002 |
| Ex. 60 – Transcript of Hearing re Motion for Discovery of Exculpatory Evidence, dated 02/27/09 | 170-61 | 10003-10009 |
| Ex. 61 — Supplemental/ Amended Motion to Withdraw Plea or Correct Invalid Sentence, dated 12/04/08 | 170-62 | 10010-10032 |
| **Defendants' Reply to Plaintiff's Response to Their Motion for Summary Judgment** | **172** | **10042-10220** |
| Index of Exhibits | 172-1 | 10057 |
| Ex. 1 – Sanford | 172-2 | 10058-10083 |
| Ex. 2 – Muscat | 172-3 | 10084-10098 |
| Ex. 3 – Puleo | 172-4 | 10099-10121 |
| Ex. 4 – 2012 Opinion | 172-5 | 10122-10152 |
| Ex. 5 – Purchase Order | 172-6 | 10153-10154 |
| Ex. 6 – Shoes | 172-7 | 10155-10159 |
| Ex. 7 – Simon | 172-8 | 10160-10166 |
| Ex. 8 – Consent #1 | 172-9 | 10167-10168 |
| Ex. 9 – Consent #2 | 172-10 | 10169-10170 |
| Ex. 10 – Glover | 172-11 | 10171-10170 |
| Ex. 11 – 7/13/10 Ev. Hearing | 172-12 | 10185-10184 |
| Ex. 12 – Russell | 172-13 | 10192-10195 |

| | | |
|---|---|---|
| Ex. 13 – Trial Day 1 | 172-14 | 10196-10200 |
| Ex. 14 – Prelim | 172-15 | 10201-10203 |
| Ex. 15 – Tolbert | 172-16 | 10204-10206 |
| Ex. 16 – Collins MSP Trans | 172-17 | 10207-10213 |
| Ex. 17 – Warrant | 172-18 | 10214-**10220** |
| **Stipulation Dismissing Plaintiff's ADA Claims** | **208** | **11453-11455** |
| **Order of Partial Dismissal of Americans with Disabilities Act claim (Count IV)** | **210** | **11457** |
| **Plaintiff's Motion to Supplement The Summary Judgment Record** | **283** | **13720-18870** |
| Index of Exhibits | 283-1 | 13730 |
| Ex. A – Report of Dr. Jeffrey Aaron | 283-2 | 13731 |
| Ex. B – Report of James Trainum | 283-3 | 13774 |
| **Defendants' Response to Plaintiff's Motion to Supplement Summary Judgment Record** | **284** | **13871-13885** |
| **Stipulation of Dismissal of Plaintiff's Claim for Postconviction Suppression of Evidence** | **249** | **13325-13328** |
| **Order of Partial Dismissal of Claim for Postconviction Suppression of Evidence Under Count I** | **282** | **13719** |
| **Order Granting Plaintiff's Motion to Supplement the Summary Judgment Record** | **290** | **14079** |
| **Opinion and Order Denying Defendants' Motion for Summary Judgment** | **307** | **14885-14911** |
| **Opinion and Order Denying Defendants' Motion for Summary Judgment (Corrected)** | **309** | **14913-14940** |

68