**Case No. 19-1612**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

**DAVONTAE SANFORD,**

*Plaintiff–Appellee*

**v.**

**MICHAEL RUSSELL and JAMES TOLBERT, in their official and/or individual capacities, jointly and severally,**

*Defendants–Appellants*

---

Appeal from the United States District Court, Eastern District of Michigan
Civil Action No. 17-13062, Hon. David M. Lawson, United States District Judge

---

## BRIEF OF APPELLEES

---

Nick Brustin
Emma Freudenberger
Anna Benvenutti Hoffmann
Bettina K. Roberts
Amelia Green
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
P: (212) 965-9081

William H. Goodman
Julie H. Hurwitz
Kathryn Bruner James
GOODMAN HURWITZ & JAMES, P.C.
1394 E. Jefferson Avenue
Detroit, Michigan 48207
P: (313) 567-6170

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT ON ORAL ARGUMENT ............................................................ vii

STATEMENT OF JURISDICTION...................................................................... 1

STATEMENT OF ISSUES .................................................................................... 2

STANDARD OF REVIEW .................................................................................... 3

STATEMENT OF THE CASE............................................................................... 5

   I.  Procedural History................................................................................... 5

   II.   Statement of Facts .................................................................................. 7

      A.   Plaintiff Davontae Sanford is innocent. ....................................... 8

      B.   Defendants Michael Russell and James Tolbert fabricate evidence and coerce a false confession from Sanford. ............................................. 9

      C.   The fabricated sketch and coerced confession are used to convict Sanford of the Runyon Street quadruple homicide. ..................................... 14

      D.   Vincent Smothers confesses that he, not Sanford, committed the Runyon Street quadruple homicide. ...................................................... 16

      E.   Russell and Tolbert double down on lies during Sanford's postconviction proceedings. ..................................................................... 18

      F.   Michigan State Police investigators develop evidence of Defendants' misconduct and Sanford is finally exonerated in 2016.................... 19

SUMMARY OF THE ARGUMENT ................................................................... 21

ARGUMENT ........................................................................................................ 26

   I.  This Court does not have jurisdiction on this interlocutory appeal to review Defendants' arguments, which all hinge on disputing the district court's factual findings. ............................................................................................. 26

   II.   This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for fabricating evidence, because they improperly rely on their own version of the facts. ......... 29

   III.   This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for coercing Sanford's false confession, because they improperly rely on their own version of the facts.......................................................................................... 36

IV.    This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for causing Sanford's malicious prosecution, because they improperly rely on their own version of the facts.................................................................................................42

    A.    Defendants influenced the decision to prosecute Sanford. .......................42

    B.    There was no probable cause to prosecute Sanford absent the fabricated evidence...............................................................................................43

    C.    Sanford was deprived of his liberty as a result of Defendants' actions...47

    D.    Sanford's criminal proceeding was resolved in his favor........................47

CONCLUSION .............................................................................................50

CERTIFICATE OF COMPLIANCE.................................................................51

CERTIFICATE OF SERVICE ........................................................................52

ADDENDUM ...............................................................................................53

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Fulminante*, 499 U.S. 279 (1991)............................................................38

*Ayers v. City of Cleveland, 773 F.3d 161 (6th Cir. 2014)*.......................................31

*Barry v. O'Grady*, 895 F.3d 440 (6th Cir. 2018)............................................... passim

*Bennett v. Krakowski*, 671 F.3d 553 (6th Cir. 2011) ................................................28

*Berryman v. Rieger*, 150 F.3d 561 (6th Cir. 1998)........................................... passim

*Bunkley v. City of Detroit*, 902 F.3d 552 (6th Cir. 2018) .......................................44

*Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017)....................................................41

*DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604 (6th Cir. 2015) ............................4

*Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ................... passim

*Haley v. Ohio*, 332 U.S. 596 (1948) .........................................................................38

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)). ....................................... 34, 39, 46

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008)........................................... passim

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) ..................................................30

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011).......................................................38

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ........................... passim

*Johnson v. Jones*, 515 U.S. 304 (1995) ........................................................... passim

*Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007)........................................................44

*Kindl v. City of Berkley*, 798 F.3d 391 (6th Cir. 2015)................................... passim

iv

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017)................................................. passim

*Livers v. Schenck*, 700 F.3d 340 (8th Cir. 2012) ........................................39

*McDonough v. Smith*, 139 S. Ct. 2149 (2019)........................................48

*Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017)................................................. 29, 42

*Northrup v. Trippett*, 265 F.3d 372 (6th Cir. 2001)................................................44

*Peterson v. Heymes*, 277 F. Supp. 3d 913 (W.D. Mich. 2017) ...............................48

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019)............................................ passim

*Rodgers v. Banks,* 344 F.3d 587 (6th Cir. 2003) .........................................4

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)........................................37

*Spak v. Phillips*, 857 F.3d 458 (2d Cir. 2017) ........................................49

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) .........................................35

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999)....................................... 25, 42

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997).....................................29

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) .......................................42

*Thompson v. Grida*, 656 F.3d 365 (6th Cir. 2011) ........................................... passim

*United States v. Johnson*, 351 F.3d 254 (6th Cir. 2003)........................................37

*United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984)................48

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015)....................................... 42, 44

*Williams v. Withrow*, 994 F.2d 284 (6th Cir. 1991) .................................................37

*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012)..................................................35

v

*Younes v. Pellerito*, 739 F.3d 885 (6th Cir. 2014) ............................................ passim

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................4

## STATEMENT ON ORAL ARGUMENT

The district court found that Defendants fabricated evidence and coerced a false confession, causing Plaintiff to spend nearly nine years wrongly imprisoned for a quadruple homicide he did not commit; based on that evidence, the district court held that Defendants were not entitled to summary judgment on Plaintiff's § 1983 wrongful conviction claims. In their opening brief, Defendants impermissibly dispute the correctness of the district court's factual findings, which this Court does not have jurisdiction to revisit on this interlocutory appeal. Accordingly, because it is not necessary—or permitted—to reach any of the issues Defendants advance, Plaintiff respectfully suggests that this appeal may be disposed of at this stage without oral argument.

## STATEMENT OF JURISDICTION

This Court does not have jurisdiction over Defendants' interlocutory appeal. "The denial of qualified immunity in a § 1983 case is a final, immediately appealable decision under the collateral order doctrine only to the extent the appeal presents a 'neat abstract issue of law.'" *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)). On the other hand, this Court "cannot decide disputed factual issues at the summary-judgment stage, and if the appeal from a denial of qualified immunity turns on an issue of fact, [it] may not exercise jurisdiction." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (citing *Johnson*, 515 U.S. at 319–20).

Where—as here—"the defendant disputes the facts on appeal, the appeal involves the ordinary issue of the existence, or non-existence, of a triable issue of fact.…[In that case,] the district court's determination that the summary judgment record raises a genuine issue of fact concerning the officials' involvement is not an immediately appealable final decision." *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011). As a result, this appeal must be dismissed. *Barry*, 895 F.3d at 445.

1

## STATEMENT OF ISSUES

1. Does this Court have jurisdiction to consider Defendants' interlocutory appeal, which impermissibly disputes the correctness of the district court's factual findings?

   Defendants say: "Yes."
   Plaintiff says: "No."

2. Could this Court reverse the district court's finding that Defendants are not entitled to qualified immunity on Plaintiff's fabrication claim, where Defendants' argument relies upon their own version of the facts?

   Defendants say: "Yes."
   Plaintiff says: "No."

3. Could this Court reverse the district court's finding that Defendants are not entitled to qualified immunity on Plaintiff's coercion claim, where Defendants' argument relies upon their own version of the facts?

   Defendants say: "Yes."
   Plaintiff says: "No."

4. Could this Court reverse the district court's finding that Defendants are not entitled to qualified immunity on Plaintiff's malicious prosecution claim, where Defendants' argument relies upon their own version of the facts?

   Defendants say: "Yes."
   Plaintiff says: "No."

## STANDARD OF REVIEW

Defendants misstate the standard of review, reciting the standard for review of a decision to *grant* summary judgment, (*see* Dkt. #31 at 26), rather than of an interlocutory appeal of a decision to *deny* summary judgment, as occurred here. Federal appellate courts generally review only final decisions, which a grant of summary judgment undeniably is. *See Barry*, 895 F.3d at 443. But a denial of summary judgment is not a final decision—the case continues on to trial—and thus "ordinarily is not appealable." *Id.* And although there is an exception to that general rule for certain appeals of orders denying qualified immunity, the exception "is a narrow one." *Id.* (quotation mark omitted). In particular, even "a defendant[] entitled to invoke a qualified immunity defense[] may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319–20.

The upshot is that not only is this Court not required "to conduct an 'independent assessment of the record' and independently review the merits of the claims," as Defendants suggest, (*see* Dkt. #31 at 27), it is not *permitted* to do so; this Court "must defer to the district court's determinations of fact," *Barry*, 895 F.3d at 443. On an interlocutory appeal like this one, this Court "lack[s] jurisdiction to review a summary judgment ruling on qualified immunity 'insofar as that order

3

determines whether or not the pretrial record sets forth a genuine issue of fact for trial.'" *Kindl*, 798 F.3d at 398 (quoting *Johnson*, 515 U.S. at 319–20).

"Indeed, ideally [this Court] need look no further than the district court's opinion, and [this Court] often may be able merely to adopt the district court's recitation of facts and inferences." *Barry*, 895 F.3d at 443 (quotation marks omitted). Even where the district court has not expressly explained what facts and inferences it found, "the presumption favoring the district court's factual determinations is such that" this Court should endeavor to determine (and defer to) the facts the district court "likely assumed" before making an independent assessment of the record. *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 611 (6th Cir. 2015).

If the Court does proceed to its own review of the record evidence, it applies the same standard that applied in the district court, which requires that it "credit all evidence presented by the nonmoving party," *Harris v. Bornhorst*, 513 F.3d 503, 509 (6th Cir. 2008)—here, Plaintiff—and "draw all reasonable inferences" in his favor, *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). "[I]f [plaintiff] is able to demonstrate that there is a genuine issue of material fact in dispute, then Defendants are not entitled to summary judgment." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *see* Fed. R. Civ. P. 56(c).

**STATEMENT OF THE CASE**

I.     **Procedural History**

In September 2007, two professional hit men murdered four people in a house on Runyon Street on the East Side of Detroit. Plaintiff Davontae Sanford—who was 14 years old at the time and had no connection to the true perpetrators—had nothing to do with this horrific crime. Nonetheless, Defendants, former Detroit Police Department ("DPD") officers Michael Russell and James Tolbert, coerced the innocent teen into falsely confessing and fabricated evidence against him. In particular, Defendants falsely claimed Sanford had created a detailed sketch of the crime scene that proved his guilt; in reality, as they now admit, Tolbert had created this sketch himself while Russell watched. Russell similarly fabricated a written confession in Q & A form—again falsely suggesting Sanford had volunteered nonpublic details about the crime—and falsely denied that he had fed Sanford information by showing him graphic crime scene photos. As a result of this unconstitutional misconduct, Sanford was wrongfully convicted of the murders. Even when, barely two weeks after Sanford's sentencing, one of the true perpetrators confessed to Russell that he had committed the murders—and that Sanford had no involvement—Defendants doubled down on their lies, causing Sanford to remain incarcerated. All told, Sanford spent nearly nine years wrongly imprisoned before a Michigan State Police ("MSP") investigation exonerated him in 2016.

Plaintiff then brought this civil rights suit. (Complaint, RE 1, PageID # 1–47.) After discovery, Defendants moved for summary judgment. (S.J. Motion, RE 148, PageID # 5890–5941.) In their papers, as the district court would later note, Defendants "brazenly misrepresent[ed] the record," (*see* S.J. Order, RE 309, PageID # 14936), and repeatedly contravened the summary-judgment standard by failing to credit Plaintiff's evidence, (*see, e.g., id.* at PageID # 14928, 14932).

Plaintiff's opposition marshalled 61 exhibits totaling over 1600 pages. (S.J. Response, RE 170, PageID # 8321–65; S.J. Response Exhibits, RE 170-2 through 170-62, PageID # 8369–10032.) This evidence included (1) admissions from both Defendants that Tolbert had actually drawn the "critical" crime scene sketch which they had falsely attributed to Sanford throughout the prosecution, (S.J. Order, RE 309, PageID # 14936; Tolbert Dep., RE 170-9, PageID # 8821–22, 8838–42; Russell Dep., RE 170-21, PageID # 9117–18); (2) abundant evidence of Sanford's actual innocence, including hard ballistics evidence linking true perpetrator Smothers to the crime and his sworn confession exonerating Sanford, (S.J. Order, RE 309, PageID # 14914; Smothers Aff., RE 170-8, PageID # 8772–97; Dandridge Dep., RE 170-32, PageID # 9343–48; MSP Report, RE 170-38, PageID # 9491–92; Corriveau Dep., RE 170-40, PageID # 9582–85); and (3) Russell's admission that, if Sanford is innocent, the only explanation for the nonpublic details in his confession is that

6

Russell fed them to him, (Russell Dep., RE 170-21, PageID # 9088–89, 9093, 9113–14.)

The district court issued a thorough, 27-page opinion and order, including over ten pages of detailed factual findings with citations to the underlying record. (S.J. Order, RE 309, PageID # 14913–40.) The district court detailed how the factual record would support a reasonable jury finding that Defendants fabricated evidence, coerced a false confession, and maliciously prosecuted Sanford, causing him to spend nine years wrongly imprisoned for a crime he did not commit. (*Id.* at PageID # 14926–37.) Because, as the district court noted, prior authority from this Court clearly established such misconduct as unconstitutional, it denied Defendants' motion for summary judgment. (*Id.* at PageID # 14926–37, 14939.) Trial was scheduled for summer 2019, but two weeks before the pretrial conference, Defendants noticed this interlocutory appeal. (*See* Notice of Hearing, RE 312, PageID # 14977; Notice of Appeal, RE 328, PageID # 16077–79.)

## II.    Statement of Facts

As required on interlocutory appeal from an order denying a motion for summary judgment based on qualified immunity—and in stark contrast to Defendants' version—Plaintiff's statement of the facts is drawn from those found by the district court: that is, facts the district court either found to be uncontested or

those which could, when considered in the light most favorable to Plaintiff, support a factual finding in his favor. *See Barry*, 895 F.3d at 443.

## A.    Plaintiff Davontae Sanford is innocent.

At approximately 11:30 pm on September 17, 2007, professional hitman Vincent Smothers and one accomplice, Ernest Davis, shot and murdered drug dealer Michael Robinson and three others in Robinson's house on Runyon Street on the east side of Detroit. (S.J. Order, RE 309, PageID # 14914.) Plaintiff Davontae Sanford, who was 14 years old at the time, was innocent of this crime: he "was not present during the attack, nor was he involved in any way with the planning of the hit, which was done entirely by Smothers and Davis"—who had no connection to Sanford or his family. (*Id.* at PageID # 14915, 14918, 14921.)[1]

When police arrived, they "found four dead bodies in the front room." (S.J. Order, RE 309, PageID # 14915.) In addition, "[i]n the southwest bedroom of the home [they found] a woman, Valerie Glover" who had been "shot five times while she was in and running from the front room…and…then ran and hid in the bedroom." (*Id.*)

---

[1] In fact, the MSP "thoroughly investigated" whether there was any connection between either Smothers or Davis and Sanford, and found none, (Corriveau Dep., RE 170-40, PageID # 9580–81), corroborating Smothers's and Davis's own testimony that they did not know Sanford, (Smothers Dep., RE 170-5, PageID # 8394; Davis Dep., RE 170-14, PageID # 8999–90).

**B.**    **Defendants Michael Russell and James Tolbert fabricate evidence and coerce a false confession from Sanford.**

Defendants Sergeant Michael Russell and Commander James Tolbert both investigated the Runyon Street murders for the Detroit Police Department ("DPD"). (S.J. Order, RE 309, PageID # 14915.) Although, "due to his supervisory role," Tolbert typically did not investigate homicides, "when the Runyon Street murders occurred, he was on the scene within hours…[and] spent hours at the scene investigating." (*Id.*)

During a neighborhood canvass shortly after the crime, Russell ran into Sanford "outside, on a street near his home," dressed in his pajamas. (S.J. Order, RE 309, PageID # 14916.) At the time, 14-year-old Sanford "had impairments such as developmental immaturity, low intelligence, and prior mental health diagnoses." (*Id.* at PageID # 14921, 14933.)[2] "Russell asked Sanford…if he had seen anything; he responded that he had not." (*Id.* at PageID # 14916.)

Nevertheless, Russell and Tolbert got Sanford's grandmother's consent to talk to him "to see if he had any information about what was going on in the area." (S.J. Order, RE 309, PageID # 14916.) They then "got into a police car with [Sanford], and…drove around…ask[ing] Sanford questions." (*Id.*) "Sanford did not make any

---

[2] More specifically, Sanford had a significant learning disorder, longstanding ADHD symptoms, and symptoms of psychological disfunction. He was also blind in one eye. (Police File, RE 170-6, PageID # 8677; Aaron Report, RE 170-23, PageID # 9164, 9170–71; MDOC Record, RE 170-46, PageID # 9631.)

9

admissions concerning the crime," but helped the police with information "about who in the neighborhood sells drugs." (*Id.*)

Sanford was then taken to police headquarters, where Russell continued to interview him "for around three or four hours, starting at 4:00 a.m." (S.J. Order, RE 309, PageID # 14916.) Again, "Sanford did not make any admissions to involvement in the crime." (*Id.* at PageID # 14917.)[3] "After the interview, the police took Sanford back home, where he went inside and fell asleep on the couch." (*Id.*)

Later that evening, "after dark, Russell again went to Sanford's home[,]…woke Sanford up," and got his mother's consent to take him back to the police station. (S.J. Order, RE 309, PageID # 14917.) Russell accused Sanford of hiding information about the Runyon Street murders, (*id.*); in reality, Sanford did not know anything about the crime, (*id.* at PageID # 14915, 14918). Russell also "told Sanford—falsely—that tests on his shoes had indicated the presence of blood." (*Id.* at PageID # 14917.) Once "[a]t the police station, in the interview room, Russell

---

[3] However, Sanford did sign a false statement that Russell had typed about the crime, which did not directly implicate him but contained a number of details that were fed to him by DPD officers. (First Statement, RE 170-2, PageID # 8370–72; Sanford Dep., RE 170-12, PageID # 8965, 8987; Sanford Decl., RE 170-16, PageID # 9011.) This is what Defendants misleadingly refer to as the "first confession." (Dkt. #31 at 36.) But because this first statement "did not make any admissions to involvement in the crime," (S.J. Order, RE 309, PageID # 14917), it was in no way significant to his criminal prosecution.

whipped out a camera from his desk,…got to showing Sanford pictures of the crime scene, and said 'This is not a game. These people lost their lives.'" (*Id.*)

At some point, Tolbert joined the interview and "spent several minutes drawing out [a] detailed sketch [of the crime scene] in his own hand." (S.J. Order, RE 309, PageID # 14917.) Tolbert "was able accurately to recall the layout due to his extensive observations of the crime scene." (*Id.*) After Tolbert finished drawing the sketch, he told Sanford to draw the bodies. (*Id.*) Sanford "had no involvement in the murders, never was inside the Runyon Street home, and did not know anything about the bodies except what Russell told and showed him." (*Id.* at PageID # 14918.) Sanford drew the bodies as directed but was able to do so "only because Russell had shown him photos of the crime scene depicting where the bodies were." (*Id.* at PageID # 14917–18.)

Out of this interaction came "two central, crucial lies that were told over and over by Russell and Tolbert before, during, and after the trial": "that Sanford drew the diagram himself, from his own knowledge of the scene, and that Sanford was not shown any photos of the crime scene depicting the bodies." (S.J. Order, RE 309, PageID # 14936.) The assertion that Sanford drew the sketch "is demonstrably and indisputably false: Tolbert now candidly admits that he drew the layout of the sketch and Sanford only drew the bodies on the sketch Tolbert created. Russell admits he was present when that was done." (*Id.*)

Russell and Tolbert both understood that the sketch was important evidence because it made it look like Sanford "knew details about the crime scene that he could only know if he was guilty." (S.J. Order, RE 309, PageID # 14918–19.) "[I]n fact[,] Tolbert considered the [sketch] to be a 'critical' piece of evidence." (*Id.* at PageID # 14918.) Although both now "claim that they were 'mistaken' in their recall of how the sketch was made[,] Tolbert's testimony makes it seem unlikely in the extreme that either of them actually 'forgot' how this 'critical' piece of evidence came into existence." (*Id.* at PageID # 14936.) Indeed, Tolbert admitted that "the process of creating the sketch stood out in [his] mind" because it was the only time he had created a sketch like this with a suspect. (*Id.* at PageID # 14918.)[4]

After the sketch was created, Tolbert "left the room, and Russell continued to question Sanford…for a couple of hours" under "circumstances…[that] rendered the

---

[4] Russell gave the same detailed false account of Sanford allegedly drawing the sketch for years, beginning shortly after the September 2007 interrogation, including such details as that he allegedly specifically remembered Sanford sketching the television in the living room. (Prelim. Hrg, RE 170-20, PageID # 9075–76; Russell Dep., RE 170-21, PageID # 9106–11, 9119–20; 7/21/09 Evid. Hrg, RE 170-37, PageID # 9435.) And Tolbert gave a matching false account including claiming—just like Russell—that he specifically remembered Sanford drawing a television set. (Tolbert Dep., RE 170-9, PageID # 8827–30, 8833–37; 7/13/10 Evid. Hrg, RE 170-11, PageID # 8928–31; Russell Dep., RE 170-21, PageID # 9104–05, 9107–09, 9112.) When confronted at his deposition with the blatant similarities between their false accounts, the only explanation Russell could provide was that it must have been a coincidence. (Russell Dep., RE 170-21, PageID # 9112, 9115–16.) At Tolbert's deposition, Tolbert could not come up with an explanation at all. (Tolbert Dep., RE 170-9, PageID # 8835–37.)

questioning coercive." (S.J. Order, RE 309, PageID # 14918, 14933.) Sanford, who was only 14 years old and "had impairments such as developmental immaturity, low intelligence, and prior mental health diagnoses," was questioned "about a heinous crime over many hours, without a parent or guardian present." (*Id.* at PageID # 14933). Russell "accosted [Sanford] with false of evidence of guilt such as supposed blood found on his shoes…[even though] no evidence exists suggesting that any blood ever was found on Sanford's clothes." (*Id.* at PageID # 14933.) Russell also told Sanford to "hurry up" and "finish this" so he could "get [him] home so [he could] be in school tomorrow," which was a "false promise[] of leniency…Russell knew would not be fulfilled." (*Id.* at PageID # 14918, 14932–33.) Instead, "Sanford was arrested and charged with the four murders." (*Id.* at PageID # 14918.)

Russell prepared a typed statement and, at the end of the interview, Sanford signed it, thereby falsely confessing to having committed the Runyon Street murders with four accomplices. (S.J. Order, RE 309, PageID # 14919–20.) Russell had typed the confession in a Q&A format, with open-ended questions, giving the false appearance that Sanford had provided narrative answers. (Second Statement, RE 170-3, PageID # 8374–75; Russell Dep., RE 170-21, PageID # 9090–91.)[5] But "everything in this statement about the circumstances of the murder must have come

---

[5] The document thus falsely suggested on its face that all of the nonpublic details in the confession had originated with Sanford. (Sanford Decl., RE 170-16, PageID # 9010.)

from Russell, because [Sanford] was not involved in the killings and did not know any details about them." (S.J. Order, RE 309, PageID # 14918.) Indeed, "[d]uring the questioning, while discussing details of the crime, Russell suggested stuff to Sanford if Sanford's responses didn't go with what Russell was saying." (*Id.*)

The confession also incorporated a false detail Russell erroneously believed to be true at the time of Sanford's interrogation: that surviving witness "Valerie Glover was shot in a back bedroom, when she actually was shot in the living room"; Russell later "admitted [that] was a conclusion he had drawn from his own observations of the crime scene." (S.J. Order, RE 309, PageID # 14920–21.) In addition, consistent with Sanford's innocence and lack of knowledge about the crime, "[n]umerous [other] details of the written statement signed by Sanford later turned out to be false." (*Id.* at PageID # 14920.) For example, "[t]he four accomplices named by Sanford…were brought in during the police investigation, but all were cleared, and none were charged with the murders…[a]nd a search of the location where Sanford said the group hid the murder weapons turned up empty." (*Id.*) "A gunshot residue test performed on Sanford's face and hands the night of the murders also came back negative." (*Id.*)

> **C.     The fabricated sketch and coerced confession are used to convict Sanford of the Runyon Street quadruple homicide.**

Sanford was arrested and "charged with four counts of murder, based solely on the purported written confession and the sketch that he supposedly had drawn."

(S.J. Order, RE 309, PageID # 14922.) "Wayne County Prosecutor Patrick Muscat…received the investigative file from the [DPD] and relied on it for his understanding of the facts of the case." (*Id.* at PageID # 14923.) "The sketch of the crime scene was in the file, and Russell told Muscat…that the sketch was drawn by Sanford…[and] that all of the details in the confession came from Sanford and none were supplied to [Sanford] by the police," (*id.*); both of these representations were false.

Sanford's confession was read into evidence at both his preliminary examination and March 2008 bench trial, and the sketch was "entered into evidence as part of [the] confession statement." (S.J. Order, RE 309, PageID # 14919, 14923.) Russell also falsely testified at both proceedings, consistently with his earlier report to the prosecutor, that "all of the facts in the written statements were volunteered by Sanford with no prompting from his interrogators, and that many of them would have been known only by the shooters." (*Id.* at PageID # 14919, 14923.) In addition, Russell falsely represented at both proceedings that "Sanford drew the sketch entirely on his own…[and] that [Russell] never showed Sanford any photographs of the crime scene." (*Id.* at PageID # 14919.)

"During a psychiatric exam ordered after his arraignment, Sanford insisted he was innocent and that the police had fabricated and coerced his confession." (S.J.

15

Order, RE 309, PageID # 14922.)[6] And Sanford *was* innocent, he "was not present…[or] involved in any way" in the murders. (*Id.* at PageID # 14915, 14918, 14921. Nonetheless, faced with the damning fabricated evidence against him, which "unquestionably affected the judgment of the trial court," (*id.* at PageID # 14923), Then-15-year-old Sanford pled guilty mid-trial to four counts of murder; on April 4, 2008, he was sentenced to 37-to-90 years, (*id.* at PageID # 14930).

> **D.      Vincent Smothers confesses that he, not Sanford, committed the Runyon Street quadruple homicide.**

Barely two weeks after Sanford's sentencing, over the course of two days on April 19 and 20, 2008, true perpetrator "[Vincent] Smothers was arrested on a warrant charging him with several other murders…[and] interrogated…by [DPD] officer[s]." (S.J. Order, RE 309, PageID # 14921–22.) During this interrogation, Smothers, a former professional hit man, "confessed to his part in seven hits involving a total of 12 murders and three attempted murders." (*Id.* at PageID # 14914, 14921–22.) After "Smothers recalled that he had used the same AK-47 to kill [another victim] that he used in the Runyon Street assault…[t]h[is] recollection prompted Smothers to also confess…that he was the one who committed the Runyon Street killings." (*Id.* at PageID # 14921.) Smothers "verified that Sanford was not

---

[6] During this examination, Sanford also described Russell showing him photographs of the victims' bodies. (Schwartz Report, RE 170-22, PageID # 9154.)

present during the attack, nor was he involved in any way with the planning of the hit, which was done entirely by Smothers and Davis." (*Id.* at PageID # 14915.)

"At some point during his interrogation…Smothers was escorted on a bathroom break by…Russell." (S.J. Order, RE 309, PageID # 14921.) "While Smothers was using the bathroom, Russell said to him, 'I heard you said that you did Runyon'—referring to the Runyon Street murders." (*Id.*) "Smothers responded, 'Yes, I did say that,' to which Russell replied that it was 'impossible,' because 'We got the kid that did that.'" (*Id.*) "Smothers then said, 'Impossible? Why do you say that? Because I did it.'" (*Id.*) Smothers never spoke to Russell again about Runyon Street and was not interrogated further about it. (*Id.*)

Of the 12 murders and three attempted murders Smothers confessed to, "the four Runyon Street killings are the only ones for which he was never charged." (S.J. Order, RE 309, PageID # 14921–22.) "[A]s the investigator in the Runyon Street case, Russell had an obligation fully to explore Smother[s]'s involvement." (*Id.* at PageID # 14922.) However, "Russell admitted that when he was informed of Smothers's involvement in April 2008, he did not do anything to follow up on the information or investigate it further." (*Id.*) Similarly, Tolbert, who at the time was the commander of the DPD homicide department, "was informed about Smothers's confessions to the multiple homicides after his interrogation in April 2008, and…acknowledged that the failure fully to investigate Smothers's admitted

17

involvement in the Runyon Street murders was an extraordinary investigative lapse."

(*Id.*)

> ### E. Russell and Tolbert double down on lies during Sanford's postconviction proceedings.

Later in 2008, "Sanford's appellate counsel learned about Smothers's confession from news reports." (S.J. Order, RE 309, PageID # 14923.) "Sanford filed a post-conviction motion asserting his innocence, supported in part by an affidavit supplied by Smothers" attesting that Smothers and Davis—not Sanford—had committed the crimes. (*Id.*)

"During a 2010 evidentiary hearing in the state court, Tolbert testified about the sketch." (S.J. Order, RE 309, PageID # 14919.)[7] "He attested that…the only way someone could know the locations of the bodies was if they were in the house during the shooting or its aftermath[,]…that all he gave Sanford was a blank piece of paper, and that Sanford drew everything on [the sketch] except for…Russell's signature." (*Id.*) Tolbert also testified at this hearing that "he found it 'significant' that [Sanford] was able to draw details into the sketch such as the location of the television set in

---

[7] Although the district court erroneously stated that Tolbert gave some of this testimony at Sanford's criminal trial in 2008, reference to the underlying evidence demonstrates that this was an inadvertent error; the testimony Tolbert is discussing on the pages cited is from the 2010 postconviction hearing. (*See* Tolbert Dep., RE 170-9, PageID # 8827–33.)

the living room; but that testimony was false, because Tolbert himself drew those details into the sketch." (*Id.* at PageID # 14918–19.)[8]

**F.    Michigan State Police investigators develop evidence of Defendants' misconduct and Sanford is finally exonerated in 2016.**

"In 2015, the Michigan State Police [("MSP")] began an investigation into alleged police misconduct surrounding the Runyon Street murders." (S.J. Order, RE 309, PageID # 14923.) During that investigation, "Tolbert finally confessed…that he had fabricated the sketch supposedly drawn by Sanford." (*Id.*)[9]

The MSP investigators also catalogued the evidence demonstrating Sanford's innocence and corroborating Smothers's guilt: for example, Smothers was able to direct police to the location of both the .45 caliber pistol used by Davis during the Runyon Street murders and a .40 caliber pistol which Smothers "found…at the

---

[8] Russell also falsely testified during the state court postconviction proceedings that Sanford had drawn the layout of the interior of the crime scene. (Russell Dep., RE 170-21, PageID # 9106–09; 7/21/09 Evid. Hearing, RE 170-37, PageID # 9435.)

[9] During his 2015 interview with the MSP, Tolbert initially continued to falsely claim that Sanford had drawn the sketch. (MSP Report, RE 170-39, PageID # 9541–42; Corriveau Dep., RE 170-40, PageID # 9590.) It was only after Tolbert drew a new sketch of the scene that looked exactly like the one he had falsely attributed to Sanford that he finally admitted he had drawn the layout of the scene. (Tolbert Dep., RE 170-9, PageID # 8825; MSP Report, RE 170-39, PageID # 9542; Corriveau Dep., RE 170-40, PageID # 9590–93, 9596–97; Sketches, RE 170-41, PageID # 9604, 9606; Tolbert MSP Interview, RE 170-42; PageID # 9611–12.) At the end of the interview, Tolbert crumpled up the new sketch that proved his misconduct and attempted to leave with it before he was stopped by investigators. (Corriveau Dep., RE 170-40, PageID # 9594–95; MSP Report, RE 170-39, PageID # 9542.) The MSP ultimately recommended perjury charges be brought against Tolbert. (Corriveau Dep., RE 170-40, PageID # 9589.)

19

scene, lying on a coffee table next to Robinson's dead body…[and] took with him when he left." (S.J. Order, RE 309, PageID # 14914, 14923–24.) And hard ballistics evidence established not only that the .45 Smothers led police to was in fact used at Runyon Street, but also that both the AK-47 Smothers used at Runyon Street and the .40 he took from the scene had been used in other murders to which Smothers confessed. (S.J. Order, RE 309, PageID # 14914; Dandridge Dep., RE 170-32, PageID # 9343–48; MSP Report, RE 170-38, PageID # 9491–92; Corriveau Dep., RE 170-40, PageID # 9582–85.) In addition, unlike Sanford, Smothers knew details about the crime, such as the fact that surviving witness Valerie Glover was shot in the front room before hiding in a back bedroom. (S.J. Order, RE 309, PageID # 14914–15.)

"On May 20, 2016, the [MSP] submitted a report of the investigation to the Wayne County Prosecutor's [O]ffice." (S.J. Order, RE 309, PageID # 14924.) On June 8, 2016, "after [this] evidence of [Sanford]'s innocence came to light," "the judgment of conviction was vacated by the stipulations of the parties," and Sanford was released. (*Id.* at PageID # 14924, 14939). "[O]n July 19, 2016, the state court dismissed all of the charges against him." (*Id.* at PageID # 14924). But by then, Sanford had spent nearly nine years wrongly imprisoned for a crime he did not commit.

20

## SUMMARY OF THE ARGUMENT

The district court held that a reasonable jury could find that Defendants Russell and Tolbert fabricated evidence and coerced a false confession from an innocent 14-year-old, causing him to spend nearly nine years wrongly imprisoned for a quadruple homicide he had nothing to do with. Ample evidence supports that conclusion. For example, for years Defendants claimed Sanford had drawn a detailed sketch of the crime scene, which allegedly proved his guilt "because it showed that Sanford knew details about the crime scene he could only know if he was guilty." (S.J. Order, RE 309, PageID # 14918.) But it is now undisputed that this was false; the crime scene layout was actually drawn by Tolbert, while Russell watched. And Sanford could not have volunteered any nonpublic information about the crime, because "he was not involved in the killings and did not know any details about them." (*Id.*) Indeed, Russell himself admits that, if Sanford is innocent, the only explanation for the nonpublic, accurate details in the confession and the sketch is that Russell fed them to him. (Russell Dep., RE 170-21, PageID # 9088–89, 9093, 9113–14.)

That such investigative misconduct is unconstitutional is beyond any reasonable dispute; the district court's decision denying qualified immunity is similarly unimpeachable. This case should have proceeded to a trial this summer, as

21

was scheduled. But Defendants, apparently reluctant to put their factual defense to a jury, instead noticed this interlocutory appeal.

However, a defendant whose motion for summary judgment has been denied is generally not entitled to an interlocutory appeal, and the mere fact that a qualified immunity defense has been asserted does not create an automatic exemption from this usual rule. Instead, "[w]hen the District Court denies qualified immunity to government officials on summary judgment, [this Court's] jurisdiction to hear an interlocutory appeal of that ruling is narrow." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998).

In particular, this Court does not have jurisdiction, at this stage, to resolve disputes of fact or review the district court's determination that the record raises genuine issues of material fact. *Thompson*, 656 F.3d at 367; *Johnson*, 515 U.S. at 313. Rather, this Court "must defer to the district court's determinations of fact." *Barry*, 895 F.3d at 443. To the extent Defendants suggest that they are entitled to *de novo* review of the district court's decision, and in particular an "independent assessment of the record," (Dkt. #31 at 26–27), that is flat wrong.

Defendants' brief is far afield from what would be permissible on this interlocutory appeal. Not only does it not accept the facts as found by the district court, as required, it barely mentions them. A reader of Defendants' statement of facts would hardly know the district court had issued a decision at all, let alone that

its findings establish the record that must be taken as true at this stage. Instead, Defendants' brief is rife with assertions of fact that are irrelevant, disputed, or outright contrary to the explicit findings made by the district court. For example, Defendants begin their brief with the assertion that Sanford "knowingly and voluntarily confessed to murder," (Dkt. #31 at 12), but the district court found the opposite—that the evidence supports a finding the confession was coerced, (S.J. Order, RE 309, PageID # 14931–33). And Defendants have an entire section of their argument titled "The Sketch is Not Fabricated," (Dkt. #31 at 40), but the district court, again, found the opposite—that there was "ample evidence in the record" that Tolbert fabricated the sketch and Russell knowingly presented that fabricated evidence to the prosecutor, (S.J. Order, RE 309, PageID # 14929).

Compounding this error, Defendants never make the only argument that *would* be permissible at this stage: that, taking the facts as found by the district court and in the light most favorable to Plaintiff, they are entitled to qualified immunity as a matter of law. Perhaps this is because they cannot make a colorable argument to that effect. Framing an innocent person for murder, fabricating evidence against him, coercing him to falsely confess, and causing his baseless prosecution are all obviously unconstitutional—as this Court has repeatedly held. *See, e.g.*, *Peterson v. Heymes*, 931 F.3d 546, 555–56 (6th Cir. 2019); *Jackson v. City of Cleveland*, 925 F.3d 793, 825–26 (6th Cir. 2019); *King*, 852 F.3d at 582–83; *Harris*, 513 F.3d at

23

511–16; *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006). There are no more fundamental violations of the Constitution.[10]

Defendants largely ignore this controlling, on-point authority in favor of out-of-circuit cases—either unpublished, district-court decisions or decisions arising in different contexts. Although there is no shortage of prior decisions from this Court in § 1983 wrongful conviction suits, Defendants do not cite a *single* such case reaching the result they advocate: reversing a district court denial of summary judgment on a fabrication, coercion, or malicious prosecution claim. For good reason: the facts as found by the district court are squarely within the bounds of what this Court has found both actionable and not entitled to qualified immunity. For example, this Court has repeatedly recognized that precisely what Defendants did here—falsely suggesting nonpublic information originated with the suspect when it actually was fed by the police—is fabrication of evidence for which officers may be held liable. *See Gregory*, 444 F.3d at 741–42 (officers could be held liable for falsely informing prosecutors "that they did not tell [plaintiff] non-public information about the crime only the perpetrator could know");[11] *Spurlock v. Satterfield*, 167 F.3d 995,

---

[10] Thus, even had Defendants ever made the only arguments over which this Court has jurisdiction—which they didn't—binding authority would compel this Court to affirm.

[11] Defendants misstate the holding of *Gregory*, (Dkt. #31 at 32), confusing its discussion of a § 1983 *Brady* claim with its treatment of the separate § 1983 fabrication claims.

24

1002 (6th Cir. 1999) (holding officer could be held liable for fabrication including "supplying [witness] with the necessary details of the homicide" to create false impression the later statement was reliable).

In sum, this Court does not have jurisdiction to review the claims Defendants raise, which have no merit in any event. Defendants' appeal should be dismissed, and this case remanded for trial.

25

# ARGUMENT

**I.    This Court does not have jurisdiction on this interlocutory appeal to review Defendants' arguments, which all hinge on disputing the district court's factual findings.**

The general rule, "deeply rooted in American law," is that federal courts of appeal "have jurisdiction to hear appeals only from final decisions"; "[b]ecause the denial of summary judgment is not a final decision, it ordinarily is not appealable." *Barry*, 895 F.3d at 443 (quotation marks omitted). Although there is an exception "[w]hen the District Court denies qualified immunity to government officials on summary judgment, [this Court's] jurisdiction to hear an interlocutory appeal of that ruling is narrow." *Berryman*, 150 F.3d at 562. Jurisdiction exists "only to the extent the appeal presents a 'neat abstract issue of law.'" *Kindl*, 798 F.3d at 398 (quoting *Johnson*, 515 U.S. at 317).

Conversely, there is no interlocutory jurisdiction "where the defendant disputes the facts on appeal"; "the district court's determination that the summary judgment record raises a genuine issue of fact…is not an immediately appealable final decision and this Court lacks jurisdiction." *Thompson*, 656 F.3d at 367 (citing *Johnson*, 515 U.S. at 313) (additional citation omitted). "In other words, [this Court] cannot decide disputed factual issues at the summary-judgment stage, and if the appeal from a denial of qualified immunity turns on an issue of fact, [it] may not exercise jurisdiction." *Barry*, 895 F.3d at 443 (citing *Johnson*, 515 U.S. at 319–20).

26

As the Supreme Court has instructed, this jurisdictional limitation is necessary because

> rules that permit too many interlocutory appeals can cause harm. An interlocutory appeal can make it more difficult for trial judges to do their basic job—supervising trial proceedings. It can threaten those proceedings with delay, adding costs and diminishing coherence. It also risks additional, and unnecessary, appellate court work either when it presents appellate courts with less developed records or when it brings them appeals that, had the trial simply proceeded, would have turned out to be unnecessary.

*Johnson*, 515 U.S. at 309. And a contrary rule could swamp the appellate courts with serial appeals in the same case, each of which requires scrutiny of the factual record and therefore "consume[s] inordinate amounts of appellate time." *Id.* at 316–17.

As a result, "[a] defendant challenging a denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Thompson*, 656 F.3d at 367 (quotation marks omitted). Put another way, "this [C]ourt does not ask 'whether the officers were entitled to qualified immunity under the officers' version of the facts,' but whether the plaintiff has disputed those facts." *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014) (quoting *Thompson*, 656 F.3d at 368). "Indeed, ideally [this Court] need look no further than the district court's opinion, and [this Court] often may be able merely to adopt the district court's recitation of facts and inferences." *Barry*, 895 F.3d at 443 (quotation marks omitted).

27

Despite that "well-settled standard," *Barry*, 895 F.3d at 443, § 1983 defendants often pursue interlocutory appeals that, like this one, improperly seek to argue the facts, not the law. *See, e.g.*, *Berryman*, 150 F.3d at 562 (describing the appeal as "yet another in a long line of § 1983, interlocutory, qualified immunity appeals raising factual issues"). "Where a defendant relies…on her own disputed view of the facts, 'the appeal boils down to issues of fact and credibility determinations that [this Court] cannot make.'" *Younes*, 739 F.3d at 888 (quoting *Thompson*, 656 F.3d at 367). As a result, such appeals are routinely dismissed as outside the Court's jurisdiction. *See, e.g.*, *Barry*, 895 F.3d at 445; *Kindl*, 798 F.3d at 403; *Younes*, 739 F.3d at 890; *Bennett v. Krakowski*, 671 F.3d 553, 559–60 (6th Cir. 2011); *Thompson*, 656 F.3d at 367–68; *Berryman*, 150 F.3d at 564–65.

Defendants' appeal consistently "rel[ies] on [their] own disputed version of the facts, placing [their] appeal squarely into the category of cases that *Johnson* prohibits [this Court] from hearing." *Barry*, 895 F.3d at 445 (citation and quotation marks omitted). Indeed, Defendants never even articulate the correct standard, let alone attempt to meet it. Instead, just as they did below, Defendants make factual arguments "based on a narrow and stilted view of the evidence in the record." (S.J. Order, RE 309, PageID # 14928.) Where, as here, Defendants' "argument drifts from the purely legal into the factual realm and begins contesting what really happened,

28

[this Court's] jurisdiction ends and the case should proceed to trial." *Berryman*, 150 F.3d at 564–65.

II.     **This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for fabricating evidence, because they improperly rely on their own version of the facts.**

As this Court has recognized time and again, officers who fabricate evidence are not entitled to qualified immunity, because "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737; *see also Mills v. Barnard*, 869 F.3d 473, 486 (6th Cir. 2017); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997); (S.J. Order, RE 309, PageID # 14928). Earlier this year, this Court not only held that this principle was clearly established at least as of 1975, it also found it "difficult to countenance" any argument to the contrary, given "[t]he obvious injustice inherent in fabricating evidence to convict…innocent men." *Jackson*, 925 F.3d at 825–26. The district court's ruling that the prohibition on fabricating evidence was clearly established in 2007 was plainly correct, as was its observation that Defendants' "position that there is some doubt" on this question "borders on the frivolous." (S.J. Order, RE 309, PageID # 14929–31.)

The district court also specifically found that Plaintiff's evidence created triable issues of material fact as to whether Defendants fabricated the crime scene

29

sketch and Sanford's confession,[12] both of which were used to prosecute and convict

Sanford. As to the sketch, the court found:

> There is ample evidence in the record demonstrating that Tolbert fabricated the sketch of the crime scene that formed a critical piece of the evidence used to charge and convict Sanford, and Russell presented that evidence to the prosecutor, explicitly representing that it was created entirely by Sanford, with no input from the defendants.

(S.J. Order, RE 309, PageID # 14929.) Similarly, the Court highlighted evidence in

the record that Russell fabricated the confession: he falsely told the prosecutor "that

all of the details in the confession came from Sanford and none were supplied to him

by the police," (*id.* at PageID # 14923), whereas in actuality "everything in [the]

statement about the circumstances of the murder…c[a]me from Russell, because

[Sanford] was not involved in the killings and did not know anything about them,"

---

[12] As Plaintiff's summary judgment brief made clear, Plaintiff's fabrication claims arise out of (1) the crime scene sketch, and (2) the false confession. (S.J. Response, DE 170, PageID # 8348–49.) Defendants' assertions that Plaintiff is pursuing fabrication claims based on Sanford's first statement to officers on September 18, 2007 (which did not admit involvement in the crime and was in no way significant to his criminal prosecution), or Defendants' testimony (for which they have absolute immunity), (*see* Dkt. #31 at 36–38, 42), are incorrect. In any event, the law is clear that "[s]ubsequent testimony cannot insulate previous fabrications of evidence.… Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from actions for redress." (S.J. Order, RE 309, PageID # 14930 (quoting *Gregory*, 444 F.3d at 738–39)); *see also Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2002).

(*id.* at PageID # 14918).[13] *Cf. Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (holding evidence of innocence helped prove claims of police misconduct by "increasing the likelihood that [officers] fed [witness] details about the case").

These findings of genuine issues of material fact are as well supported as the district court's legal conclusions. But this Court not only *need not* review these findings, it *cannot*—"this Court lacks jurisdiction" to review "the district court's determination that the summary judgment record raises a genuine issue of fact." *Thompson*, 656 F.3d at 367. That resolves the first question before the Court: Defendants' appeal of the fabrication claim must be dismissed.

Moreover, Defendants' entire attempt at a "legal" argument, although styled as a request for qualified immunity, is really an improper challenge to the district court's determination that a reasonable jury could find Defendants fabricated the sketch and confession. (*See, e.g.*, Dkt. #31 at 36 (heading argument "There is Insufficient Evidence" and claiming "Plaintiff failed to meet his evidentiary burden").) Such challenges are outside this Court's jurisdiction on an interlocutory

---

[13] Defendants claim the district court abused its discretion by considering Sanford's affidavit explaining that, while he did not remember exactly who said what during the interrogation, he could not have volunteered nonpublic information about the crime because he is innocent and did not know any. (*See* Dkt. #31 at 16 n.2; Sanford Aff., RE 170-16, PageID # 9010–11.)  But Russell admitted the same thing—that, if Sanford is innocent, the only explanation for the nonpublic accurate details in the confession and sketch is that Russell provided those details to Sanford. (Russell Dep., RE 170-21, PageID # 9088–89, 9093, 9113–14.)

appeal. *See, e.g.*, *Berryman*, 150 F.3d at 565 ("Because the defendants' appeal attempts to persuade us to believe their version of the facts, we must dismiss the appeal.").

For example, Defendants devote nearly three pages to discussing an alleged requirement for fabrication claims—what they term "active deception"—that they simply made up; it does not appear in a single § 1983 fabrication case in (or out) of this Circuit. (Dkt. #31 at 31–33.) But even if this were a requirement (it isn't), by the district court's own articulation of the facts in the light most favorable to Plaintiff, it would be met. Indeed, the district court called the misrepresentations that Sanford (1) drew the crime scene sketch and (2) was never shown photos of the scene "two central, crucial lies that were told over and over by Russell and Tolbert before, during, and after the trial." (S.J. Order, RE 309, PageID # 14936.) As the district court noted, it is now undisputed that Tolbert drew the sketch, and Defendants' only explanation for their repeated contrary claims—that they allegedly "'forgot' how this 'critical' piece of evidence came into existence"—is "unlikely in the extreme." (*Id.*) In other words, Defendants' argument about so-called "active deception" ignores the threshold requirement that they "concede the most favorable view of the facts to the plaintiff for purposes of the appeal," and "relies instead on [their] own disputed view of the facts," depriving this Court of jurisdiction. *Younes*, 739 F.3d at 888 (quotation marks omitted).

32

Similarly, Defendants seek to dispute the district court's finding that there is a genuine issue of material fact as to whether Defendants' fabrications of the confession and crime scene sketch caused Plaintiff's wrongful conviction. As the district court expressly found, "the sketch misrepresented as Sanford's own work…unquestionably affected the judgment of the trial court before which [he] was convicted." (S.J. Order, RE 309, PageID # 14930.) Defendants point to other evidence in the record that they claim supports their contrary argument that the guilty plea was independent of Defendants' misconduct. (*See* Dkt. #31 at 38.) But while Defendants will be free to argue to the jury that the innocent teen's plea to four murders he did not commit was unrelated to their fabrication of what they admit was "critical" evidence against him, (*see* S.J. Order, RE 309, PageID # 14934), they may not do so in this interlocutory appeal. Defendants are, yet again, improperly asking this Court to "decide disputed factual issues at the summary-judgment stage," which is outside this Court's jurisdiction. *Barry*, 895 F.3d at 443.

Even if interpreted—generously—as a legal argument, Defendants' assertion that Plaintiff's claims are barred because of his plea is foreclosed by this Court's recent decision in *Jackson v. City of Cleveland*, which confirmed the multiple ways causation for a § 1983 fabrication claim may be established. In *Jackson*, the three plaintiffs were convicted of murder in 1975, based largely on the purported eyewitness testimony of a 12-year-old boy named Edward Vernon who had not

actually seen the shooting, but was rather recounting rumors he had heard. *See* 925 F.3d at 803–04. After Vernon did not identify two of the plaintiffs in a line-up, the defendant officers coerced him into signing a statement falsely indicating he had failed to identify the suspects because he was scared of retaliation from the plaintiffs. *Id.* at 804–05. Vernon falsely testified at all three of the plaintiffs' separate trials, but the fabricated statement about the lineup was introduced only at one, by the criminal defense as impeachment. *Id.* at 816. In moving for summary judgment in the § 1983 suit, the defendant officers argued—and the district court held—that "there was insufficient evidence that the fabricated statement affected the decision of the jury." *Id.*

This Court reversed. It held that "the relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." 925 F.3d at 816. Thus, for example, "fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Id.* (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)). Alternatively, the plaintiffs could prove "that the falsified statement caused the criminal verdicts because the statement coerced Vernon to testify in conformance with it." *Jackson*, 925 F.3d at 817.

Here, Plaintiff can similarly establish causation in multiple ways. First, as the district court found, "Sanford was charged with four counts of murder, based solely

34

on the purported written confession and the sketch that he supposedly had drawn." (S.J. Order, RE 309, PageID # 14922.) Had Sanford not been charged, he would not have been wrongfully convicted—irrespective of whether his case ended in a guilty plea or a verdict. Second—and unlike in *Jackson*—here the fabricated evidence *was* introduced into evidence, both at the preliminary examination and at trial. (*Id.* at PageID # 14919, 14923.) Third, the timing of the plea—immediately after Russell falsely testified about the sketch—strongly supports the inference of causation. (3/18/08 Trial, RE 170-26, PageID # 9244–66; Plea Form, RE 170-50, PageID # 9736.)

As the district court noted in rejecting this same argument at the motion-to-dismiss stage, "[D]efendants' position that they should be *absolved* of liability for stacking the deck against the plaintiff because their efforts to corner him into a guilty plea *succeeded* is nonsense, and they cite no authority to support it." (Order on MTD, RE 142, PageID # 5859 (emphasis in original)); *see also, e.g.*, *Spencer v. Peters*, 857 F.3d 789, 800–01 (9th Cir. 2017) (reinstating jury verdict in wrongful conviction suit where jury found the defendants' fabrication of evidence caused the plaintiff to enter *Alford* plea); *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012) (reversing district court's dismissal of claim where plaintiffs alleged defendants "amassed false evidence that was used to box [p]laintiffs into entering guilty pleas").

35

Defendants still cite no cases anywhere finding a fabrication claim barred because of a now-vacated guilty plea; the only authority they cite addresses what claims a criminal defendant may raise on direct appeal or in habeas while his conviction due to a guilty plea remains intact. (Dkt. #31 at 34–35.) But the vacatur of a conviction is an extraordinary event which has significant legal effect. For example, this Court just ruled that a § 1983 wrongful conviction plaintiff was free to argue in his civil rights suit that his confession was coerced—even though he had lost that argument in the criminal court—because "the criminal judgment ha[d] been vacated." *Peterson*, 931 F.3d at 554. And although Defendants are clearly aware of both *Jackson* and *Peterson*—even citing them in their brief on unrelated points, (*see* Dkt. #31 at 60, 63–64)—they ignore their obvious application to these issues.

**III.    This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for coercing Sanford's false confession, because they improperly rely on their own version of the facts.**

As the district court properly found, "[f]or more than 50 years, it has been established that an accused's confession must be made freely, voluntarily and without compulsion or inducement of any sort." (S.J. Order, RE 309, PageID # 14931 (quotation marks and citation omitted).) "In determining whether a confession is compelled, the constitutional inquiry is whether 'a defendant's will was overborne in a particular case,' considering 'the totality of all the surrounding

36

circumstances.'" *Peterson*, 931 F.3d at 555 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

As with the fabrication claim, the district court specifically found that "[f]act questions…preclude summary judgment on the defendants' qualified immunity defense" on Plaintiff's coercion claim. (S.J. Order, RE 309, PageID # 14933.) And, yet again, Defendants seek to challenge the district court's factual findings—which this Court does not have jurisdiction to hear on this interlocutory appeal. *Thompson*, 656 F.3d at 367; *Johnson*, 515 U.S. at 313.

As this Court has long recognized, promises of leniency can be objectively coercive if they are "broken or illusory." *United States v. Johnson*, 351 F.3d 254, 261–62 (6th Cir. 2003) (relying on *Williams v. Withrow*, 994 F.2d 284, 287–90 (6th Cir. 1991), in which the Court held a suspect's admissions involuntary where the "statements were conditioned on his belief that he would be released if he talked" after officers had promised him he "would 'walk' if he told the truth."). In light of that clearly established law, the district found that "[t]he evidence amply supports Sanford's allegations that Russell made false promises of leniency to Sanford, which Russell knew would not be fulfilled." (S.J. Order, RE 309, PageID # 14932–33 (citation omitted).) For example, while pressuring Sanford to confess, "[Russell] said to Sanford, 'We gotta hurry up. Let's finish this so I can get you home so you can be in school tomorrow.'" (*Id.* at PageID # 14918.) But after Sanford bowed to

37

Russell's pressure and signed the fabricated confession, he "was arrested and charged with the four murders," (*id.*), marking the start of his nearly nine years of wrongful incarceration.

Although this false promise, alone, is enough to support a finding of coercion, as the district court found, there was much more:

> In addition to the false promises of leniency, the plaintiff has advanced evidence on which a jury readily could conclude that other circumstances of the interrogation also rendered the questioning coercive, where Russell questioned a 14-year old suspect about a heinous crime over many hours,[14] without a parent or guardian present, accosted him with false evidence of guilt such as supposed blood found on his shoes (no evidence exists suggesting that any blood ever was found on Sanford's clothes), and where the plaintiff also has offered expert testimony suggesting that he had impairments such as developmental immaturity, low intelligence, and prior mental health diagnoses.

(S.J. Order, RE 309, PageID # 14933.); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272–273 (2011) ("Addressing the specific context of police interrogation, we have observed that events that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.'") (quoting *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion)); *Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991) (defendant's history of stress is a factor supporting finding of coercion). The

---

[14] By the time Sanford was arrested in the early morning of September 19, the 14-year-old had been in police custody for over 18 of the last 24 hours. (Police File, RE 170-6, PageID # 8675; 3/17/08 Trial, RE 170-10, PageID # 8879; Sanford Dep., RE 170-12, PageID # 8958; Consent Form, RE 170-17, PageID # 9013.)

required totality of the circumstances analysis makes the coercion question often unsuitable to determination on summary judgment. *See Halsey*, 750 F.3d at 305–09; *Livers v. Schenck*, 700 F.3d 340, 352–54 (8th Cir. 2012).

This Court has repeatedly denied qualified immunity in less coercive circumstances. Take, for example, *Harris v. Bornhorst*. There, an officer aggressively interrogated a 12-year-old until he ultimately confessed to the murder of a neighbor, before later recanting. Under the circumstances—which "demonstrated that Harris was unfamiliar with details of the crime that the perpetrator would have known" and only acquiesced to the scenarios fed by the officer after repeated questioning outside the presence of counsel or his mother—the Court held that the confession was obviously "involuntary as a matter of law." 513 F.3d at 507–08, 512 (denying qualified immunity to prosecutor on summary judgment who authorized arrest based on the coerced confession).

Or consider *Peterson v. Heymes*. Peterson, who was 22 years old at the time he confessed to a murder he did not commit, alleged that the defendants "knew but ignored the fact that [he] was brain-damaged, emotionally unstable, depressed, and suicidal[,]…fed him information to provide in his statements, and promised he would be sent to a psychiatric hospital instead of prison if he confessed." 931 F.3d at 555. Although the defendants argued they were entitled to qualified immunity because "there was nothing inherently coercive or improper about their interrogation

techniques"—and the criminal court had found the confession voluntary—this Court disagreed. *Id.* at 555–56.

Here, Defendants cannot argue that the facts—as found by the district court and established by the record—entitle them to qualified immunity under this Court's law. Instead, they seek to paint their own picture of the interrogation, unrecognizable from the one laid out by the district court; as the district court described it, they "point to contrary facts in the record, shading them by their own arguments." (S.J. Order, RE 309, PageID # 14932.) For example, Defendants describe the 14-year-old Sanford as "street savvy," and dispute the record evidence of his cognitive limitations, (Dkt. #31 at 51–53); they also dispute that Sanford—who began to cry when Russell returned to his home to bring him in for the second interrogation, (*see* Sanford Dep., RE 170-12, PageID # 8962)—could have been scared because he "never asked for his mother or grandmother, or expressed that he was scared," (Dkt. #31 at 52). This is manifestly improper; "this Court does not ask whether the officers were entitled to qualified immunity under the officers' version of the facts." *Younes*, 739 F.3d at 889 (quotation mark omitted).

Unable to distinguish the governing law from this Court—which demonstrates that they are not entitled to qualified immunity[15]—Defendants instead focus almost exclusively on a habeas decision from the Seventh Circuit, *Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017). (*See* Dkt. #31 at 43–56.) But even were the Court to consider *Dassey*, it does not help Defendants. First, like this Court, the *Dassey* court was required to accept the factual findings made by the trial court. But those facts are different: Sanford was only 14 years old (Dassey was 16); Sanford was questioned extensively overnight (Dassey was questioned for three hours during the day); Sanford requested a lawyer (Dassey fully waived his rights); and Sanford was explicitly (and falsely) promised he would be taken home (Dassey was not made any specific promises at all). 877 F.3d at 301, 305–06, 312, 315. Even so, all the *Dassey* court held—given the deferential posture required on habeas review—was that the state court's finding that the confession was not coerced was not "so lacking in justification that there was an error…beyond any possibility for fairminded disagreement." *Id.* at 302 (quotation mark omitted).

---

[15] *Harris* and *Johnson* were cited by the district court and Plaintiff below, (S.J. Order, RE 309, PageID # 14932–33; S.J. Response, RE 170, PageID # 8358–59, 8361–62); Defendants' brief does not mention either. Defendants do cite *Peterson*, which was decided after the district court issued its opinion, for another point, (Dkt. # 31 at 63–64), yet they ignore its obvious application on the coercion claim.

41

IV.     **This Court does not have jurisdiction over Defendants' challenge to the district court's ruling that a reasonable jury could hold them liable for causing Sanford's malicious prosecution, because they improperly rely on their own version of the facts.**

Just like their challenges to the fabrication and coercion claims, Defendants' arguments about the malicious prosecution claim are about the facts, not the law. There is no dispute over the elements of a Fourth Amendment § 1983 malicious prosecution claim: (1) the defendant "made, influenced, or participated" in the decision to prosecute; (2) the prosecution was without probable cause; (3) that the plaintiff was deprived of his liberty; and (4) that the criminal proceeding resolved in plaintiff's favor. *Mills*, 869 F.3d at 479–80. Nor is there a dispute that this law has been clearly established since well before the events in this case. *See, e.g.*, *Gregory*, 444 F.3d at 749–50 (citing *Spurlock*, 167 F.3d at 1006–07); *see also Webb v. United States*, 789 F.3d 647, 660, 665–66 (6th Cir. 2015) (holding officer violated clearly established right to be free from malicious prosecution by fabricating evidence that defendant was a drug dealer in 2005).

A.     **Defendants influenced the decision to prosecute Sanford.**

Defendants cannot dispute that, if they fabricated evidence that "ultimately influenced [Sanford's] continued detention," that would satisfy that first element. *Mills*, 869 F.3d at 482 (quoting *Sykes*, 625 F.3d 294, 316 (6th Cir. 2010)); (S.J. Order, RE 309, PageID # 14935). So Defendants again resort to contesting the facts, claiming "the sketch is not fabricated." (Dkt. #31 at 60.) But the district court found

42

it was, (S.J. Order, RE 309, PageID # 14929), and this Court does not have jurisdiction to review that factual determination. *Thompson*, 656 F.3d at 367; *Johnson*, 515 U.S. at 313.

Although that alone is more than sufficient to satisfy this element, the district court *also* found a genuine issue of material fact as to whether Russell "explicitly represent[ed]" to the prosecutor that the sketch "was created entirely by Sanford, with no input from…[D]efendants" and that he made these false representations about the sketch and similar ones about the confession "during the charging…discussions"—*i.e.,* independent of his preliminary hearing  or trial testimony. (S.J. Order, RE 309, PageID # 14929); *see also King*, 852 F.3d at 586–91 (denying summary judgment where there was a genuine issue of material fact whether officer made any false statements or omissions independent of his false grand jury testimony). Defendants simply disagree with the district court's assessment of the facts. (Dkt. #31 at 59–60.) But while they may present those factual arguments at trial, they may not do so here. *Kindl*, 798 F.3d at 400–01.

## B.    There was no probable cause to prosecute Sanford absent the fabricated evidence.

Defendants' argument that this Court should reverse the denial of summary judgment based on specific evidence they claim demonstrates probable cause, which "depend[s] on this court's accepting the defendants' evidence as being more persuasive than the district court found it to be, and more persuasive than [Plaintiff's]

43

counterargument," is precisely the type of argument that may *not* be made on interlocutory appeal. *See Bunkley v. City of Detroit*, 902 F.3d 552, 566 (6th Cir. 2018) (holding there was no jurisdiction to consider defendant's fact-based interlocutory appeal arguing that "proof of probable cause…entitles her to summary judgment on the malicious prosecution claim"). Indeed, it is well-settled that "in section 1983 cases, the existence of probable cause usually poses a jury question." *Webb*, 789 F.3d at 665 (quotation marks and alteration omitted); *see also Gregory*, 444 F.3d at 751 ("We note that whether or not probable cause existed in the absence of the hair evidence, or whether probable cause would have been destroyed by a finding…that the hairs from the crime scene could not have come from Plaintiff, is an issue of fact for the jury.").

Probable cause in the context of a malicious prosecution claim exists only where "facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of *the crime charged*." *Webb*, 789 F.3d at 660 (emphasis added) (quotation marks and alteration omitted).[16] Here, Defendants never argue that, absent the evidence they fabricated and coerced, there would be sufficient basis to prosecute Sanford for the quadruple homicide. For good reason;

---

[16] The case Defendants cite, *Northrup v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001), deals with probable cause to *arrest*, not probable cause to prosecute. (Dkt. #31 at 60); *see also, e.g., Johnson v. Knorr*, 477 F.3d 75, 81–85 (3d Cir. 2007) (describing difference in probable cause standards for false arrest and malicious prosecution claims).

44

the pieces of evidence they fabricated and coerced were, as the district court found, "by far the dominant facts that drove the prosecution." (S.J. Order, RE 309, PageID # 14937.) Rather, the most Defendants even assert is that they could have had probable cause to charge Plaintiff with unspecified "crimes *related* to the Runyon Street murders," (Dkt. #31 at 61 (emphasis added)), which is not enough.

Furthermore, on summary judgment, the probable cause analysis must be conducted based on the facts taken in the light most favorable to the plaintiff, including all reasonable inferences drawn in his favor. *King*, 852 F.3d at 582 (reversing district court's grant of summary judgment to the defendants for failure to consider probable cause record in light most favorable to the plaintiff). Defendants utterly fail to do so here. (*See* Dkt. #31 at 61.) For example, Defendants assert they have probable cause because "Plaintiff admittedly lied to Russell." (*Id.*) But the "lie" is the false confession Defendants coerced and fabricated, (*see, e.g.*, Sanford Dep., RE 170-12, PageID # 8965, 8977, 8987), which is hardly "independent of any wrongful acts by Defendants," as Defendants concede any probable cause evidence would have to be. Similarly, Defendants point to the surviving witness's description of the perpetrator as "young," (*see* Dkt. #31 at 61), but ignore evidence that she actually initially described him as being in his 30s, (S.J. Order, RE 309, PageID # 14921), before Russell influenced her by telling her that "little boy Davontae" committed the crime, (Glover Dep., RE 170-7, PageID # 8766–68).

45

Defendants also claim there were "blood-like stains" on Sanford's shoes, (*see* Dkt. #31 at 61), but the district court already determined there was no blood and that Russell's suggestion to the contrary was false, (S.J. Order, RE 309, PageID # 14917, 14933).[17] And Defendants point to canine track evidence leading to Sanford's street (but not him or his home), (*see* Dkt. #31 at 61), even though the DPD itself found this evidence to be inconclusive, (3/18/18 Trial, RE 170-26, PageID # 9235–39.) Finally, Defendants point to gunshot residue on a pair of pants found in Sanford's house, (*see* Dkt. #31 at 61), but ignore (1) that a gunshot residue test on Sanford's face and hands had come back negative, (S.J. Order, RE 309, PageID # 14920), and (2) the evidence indicating that those pants weren't Sanford's, (Sanford Aff., RE 170-16, PageID # 9010). That leaves only that Sanford was found on the street where he lived and his shoes were in the washing machine of his own house, which falls far short of establishing independent probable cause. Indeed, far less evidence implicated Sanford than what this Court held to be insufficient in *King*, 852 F.3d at 582, and *Harris*, 513 F.3d at 511–16. *See also Halsey*, 750 F.3d at 299–302.

---

[17] Defendants' continued insinuation that there is blood on Sanford's shoes—and that additional DNA testing on the shoes might somehow incriminate him—is baseless and troubling. Not only did the district court make a factual finding that there was no blood, (S.J. Order, RE 309, PageID # 14917, 14933), but forensic testing on the shoes has determined that no blood was present, (Laboratory Report, RE 334-8, PageID # 16135).

**C.    Sanford was deprived of his liberty as a result of Defendants' actions.**

Defendants' reprise of their argument that Sanford's guilty plea somehow prevents him from "establish[ing] that he suffered a deprivation of liberty as a result of the criminal proceedings," (Dkt. #31 at 62), is just as wrong as it was in the context of the fabrication claim. *See supra* Section II (discussing why Defendants' assertion that Plaintiff's claims are barred because of his plea are foreclosed by this Court's recent decision in *Jackson*). It is undisputed Plaintiff spent nine years incarcerated; the district court's conclusion that a jury could find that was due to Defendants' misconduct, (S.J. Order, RE 309, PageID # 14930), is not only clearly correct, it is also a factual determination unreviewable by this Court on this interlocutory appeal, *see Barry*, 895 F.3d at 445.

**D.    Sanford's criminal proceeding was resolved in his favor.**

Finally, Defendants claim that dismissal of all charges against Sanford and his release from custody did not amount to a termination of the proceedings in his favor. Not so. As the district court found, "the judgment of conviction was vacated by the stipulation of the parties *after evidence of the plaintiff's innocence* came to light," (S.J. Order, RE 309, PageID # 14939 (emphasis added)), which the district court also termed an "[e]xoneration," (*id.* at PageID # 14922). Indeed, after its reinvestigation, the MSP concluded that there was no evidence that Sanford had been involved in the Runyon Street murders and requested homicide charges against

47

Smothers and Davis. (Corriveau Dep., RE 170-40, PageID # 9578–81; Warrant Request, RE 170-44, PageID # 9620–24.) This is a favorable termination by any reasonable measure. Defendants yet again rely on their "own disputed view of the facts," which they may not do on this appeal. *Younes*, 739 F.3d at 888.

Defendants then point to *Peterson* as an example of a clearly favorable termination, suggesting "Plaintiff's dismissal is different." (Dkt. #31 at 64.) That's a curious assertion; if anything, Plaintiff's case is stronger. When Peterson sought to overturn his conviction based on new DNA evidence excluding him, the prosecutor "opposed the motion and also argued that a new trial was not warranted." *Peterson v. Heymes*, 277 F. Supp. 3d 913, 920 (W.D. Mich. 2017). Although the prosecutor subsequently dismissed the prosecution on unspecified grounds, *Peterson*, 931 F.3d at 552, there is no indication it was due to a concession by the prosecutor that Peterson was "conclusively ruled out as the perpetrator," as Defendants claim, (Dkt. #31 at 64).

An acquittal, which is "unquestionably a favorable termination," *McDonough v. Smith*, 139 S. Ct. 2149, 2160 n.10 (2019), "does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt," *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984). Thus, even were it true that there were "unanswered questions remain[ing] in the case"—which Plaintiff vigorously disputes and which is inconsistent with the factual record as

48

found by the district court—that would not bar Plaintiff's malicious prosecution claim. Similarly, Defendants' assertion that a dismissal must be made with prejudice is incorrect; "as a general matter a *nolle prosequi* [i.e., a dismissal without prejudice] constitutes a 'favorable termination' for the purpose of determining when a Section 1983 claim accrues." *Spak v. Phillips*, 857 F.3d 458, 463 (2d Cir. 2017) (noting the weight of common law and federal cases support that position).

## **CONCLUSION**

The facts as found by the district court establish egregious wrongdoing by Defendants: that they fabricated evidence and coerced a false confession from an innocent 14-year-old, causing him to spend nearly nine years wrongly imprisoned for a quadruple murder he did not commit. As such misconduct is clearly unconstitutional, Defendants' only hope is to try to dispute those facts. But the law is clear—they may not do so on an interlocutory appeal. This appeal should be dismissed as outside this Court's jurisdiction, and the case remanded for trial.

Dated: November 22, 2019

**/s/ Anna Benvenutti Hoffmann**
Nick Brustin
Emma Freudenberger
Anna Benvenutti Hoffmann
Bettina K. Roberts
Amelia Green
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
P: (212) 965-9081

William H. Goodman
Julie H. Hurwitz
Kathryn Bruner James
GOODMAN HURWITZ & JAMES, P.C.
1394 East Jefferson Avenue
Detroit, Michigan 48207
P: (313) 567-6170

*Attorneys for Plaintiff-Appellee*

50

# CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,141 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.

Dated: November 22, 2019

**/s/ Anna Benvenutti Hoffmann**
Nick Brustin
Emma Freudenberger
Anna Benvenutti Hoffmann
Bettina K. Roberts
Amelia Green
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
P: (212) 965-9081

William H. Goodman
Julie H. Hurwitz
Kathryn Bruner James
GOODMAN HURWITZ & JAMES, P.C.
1394 East Jefferson Avenue
Detroit, Michigan 48207
P: (313) 567-6170

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

**/s/ Anna Benvenutti Hoffmann**
*Attorney for Plaintiff-Appellee*

52

# ADDENDUM

Plaintiff relies on Defendants' designation of relevant originating court documents, (Dkt. #31 at 67–76), as well as the additional relevant documents listed below:

| Document Name | Docket No. | PageID # Range |
|---|---|---|
| Notice of Motion Hearing | RE 312 | 14977 |
| Defendants' Notice of Appeal from Denial of Summary Judgment | RE 328 | 16077–79 |
| Laboratory Report | RE 334-8 | 16135 |