NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0304n.06

No. 19-1612

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
May 28, 2020
DEBORAH S. HUNT, Clerk

DAVONTAE SANFORD,

Plaintiff-Appellee,

v.

CITY OF DETROIT, MICHIGAN,

Defendant,

MICHAEL RUSSELL, and JAMES TOLBERT, in their individual capacities, jointly and severally,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: COLE, Chief Judge; McKEAGUE and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Davontae Sanford was exonerated after he had spent nine years in prison for murder. Sanford thereafter sued two of the police officers who investigated him, alleging that they had fabricated evidence and otherwise violated his constitutional rights. In a thorough opinion, the district court denied the officers qualified immunity. We affirm.

We take the district court's view of the facts in the light most favorable to Sanford. *See DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015). On the night of September 17, 2007, a hitman, Vincent Smothers, and his accomplice fatally shot four people inside a home on Runyon Street in Detroit. Within an hour, Detroit police officers, including Michael Russell and James Tolbert, responded to the crime scene.

Shortly after midnight, Russell was canvassing the neighborhood when he met Davontae Sanford, then 14 years-old, walking on the street. Russell began questioning Sanford, who denied

seeing anything unusual. Russell and Tolbert then walked Sanford home and received permission from his grandmother to continue questioning him. The officers put Sanford in a police car, bought him a cheeseburger at a local restaurant, and asked Sanford about crime in the neighborhood. Sanford named some local drug dealers, but said nothing about the Runyon Street murders. Russell then drove Sanford to the police station. Beginning around 4 a.m., Russell questioned Sanford for several more hours, but Sanford did not confess to the murder. Later that morning, the officers took him home.

That night, Russell picked up Sanford to question him again. During the drive to the station, Russell accused Sanford of lying during the first interview, and told him—falsely—that his shoes had tested positive for blood. At the station, Russell showed Sanford photographs of the victims at the crime scene, saying, "This is not a game. These people lost their lives." Russell again questioned Sanford for hours, this time sharing details about the shooting. Eventually Tolbert joined them and sketched the crime scene's layout in detail. Then Tolbert told Sanford to draw the location of the bodies on the sketch. Sanford did so, based on the crime-scene photographs Russell had shown him earlier. At the end of the interview, Russell drafted a false confession and Sanford signed it. The officers then arrested Sanford.

Russell and Tolbert thereafter told prosecutors that Sanford had drafted the confession and drawn the sketch on his own. These two documents were critical evidence in the decision to charge Sanford and later, during his 2008 bench trial. At trial, Russell testified that Sanford had confessed and drawn the sketch. Then Sanford pled guilty.

Sanford was thereafter sentenced to 37 to 90 years' imprisonment. But just two weeks later, during a break in a police interrogation, Smothers told Russell that he had committed the Runyon Street murders. Yet neither Russell nor Tolbert investigated Smothers further.

In 2015, the Michigan State Police began investigating potential officer misconduct during the Runyon Street investigation. Tolbert eventually admitted that he fabricated the crime-scene sketch attributed to Sanford. As a result of that investigation—after Sanford had already served nine years in prison—the prosecutor's office and Sanford's counsel stipulated to the dismissal of the charges against him.

Sanford thereafter brought this suit under 42 U.S.C. § 1983, claiming among other things that Russell and Tolbert had fabricated evidence, coerced his confession, and maliciously prosecuted him. The officers moved for summary judgment, which the district court denied on the ground that they were not entitled to qualified immunity for their actions. This appeal followed.

We review de novo the district court's denial of qualified immunity, but our interlocutory jurisdiction is limited to questions of law. *See Bey v. Falk*, 946 F.3d 304, 311–12 (6th Cir. 2019). Determinations of qualified immunity require us to answer two questions: first, whether the officer violated a constitutional right; and second, whether that right was clearly established in light of the specific context of the case. *See Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011). We can answer those questions in whichever order we see fit. *Id*.

Russell and Tolbert argue that they are entitled to qualified immunity against Sanford's claim that they fabricated evidence against him. In doing so, they brazenly seek to have us revisit the district court's assessment of the relevant evidence, which in this interlocutory appeal we will not do. *See DiLuzio*, 796 F.3d at 609–10.

The Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction. *See Jackson v. City of Cleveland*, 925 F.3d 793, 825–26 (6th Cir. 2019); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). Here, as the district court correctly held, a jury could find precisely that. Specifically, the evidence would allow a jury to find that

Tolbert fabricated a misleading sketch, that Russell drafted a false confession, and that together they attributed both pieces of evidence to Sanford when they gave evidence for the case to the prosecutor. The officers therefore are not entitled to qualified immunity on this claim.

Nor are the officers entitled to qualified immunity on the coerced-confession claim. The Fifth and Fourteenth Amendments bar the use of confessions that police obtain by objectively coercive means. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (collecting cases). A "broken or illusory" promise of leniency may be objectively coercive. *See United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003). The same is true for interrogating an adolescent for many hours, late at night, without an attorney present. *See, e.g.*, *Gallegos v. Colorado*, 370 U.S. 49, 54–56 (1962); *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion).

Here, a jury could find that Russell and Tolbert questioned a 14-year-old boy in the middle of the night, for hours at a time, without a parent or attorney present; that they did so for two nights in a row; that Russell falsely told Sanford that officers had found blood on his shoes; and that Russell falsely promised that Sanford could go to school the next day if he hurried up and confessed. The law made clear enough that these tactics, under these circumstances, were likely coercive. *See Harris v. Bornhorst*, 513 F.3d 503, 512 (6th Cir. 2008).

Nor are the officers entitled to qualified immunity on the malicious-prosecution claim. "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017). Here, for the reasons stated by the district court, a jury could find that Russell and Tolbert fabricated critical evidence, which they passed off to prosecutors as authentic, which in turn caused Sanford to be imprisoned for nine years. Russell and Tolbert "cannot seriously contend that a reasonable police officer would not know" that these actions would violate

Sanford's constitutional rights. *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999). And Sanford lacks any "outstanding criminal judgment" that would bar his malicious-prosecution claim. *See Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

The officers' remaining arguments are based on factual disputes, which we lack jurisdiction to review. *See Bey*, 946 F.3d at 311–12.

The district court's order is affirmed.